## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **GARY TRINIDAD,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19-2683-DDC |
| | ) | |
| **AGILITI HEALTH, INC.** | ) | |
| **f/k/a Universal Health Systems, Inc.,** | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF GARY TRINIDAD'S MEMORANDUM IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,

By: /s/ *Dennis E. Egan*
Dennis E. Egan, Mo. Bar # 27449
THE POPHAM LAW FIRM, P.C.
712 Broadway, Suite 100
Kansas City, MO  64105
Telephone: (816) 221-2288
Facsimile: (816) 221-3999
E-Mail: degan@pophamlaw.com

By: /s/ *Tiffany B. Klosener*
Tiffany B. Klosener, MO Bar #47078
4600 Madison Avenue, Suite 810
Kansas City, Missouri 64112
Telephone: 816.283.8738
Facsimile: 816.283.8739
Email: tklosener@hslawllc.com

**ATTORNEYS FOR PLAINTIFF**

## TABLE OF CONTENTS

I.      STATEMENT OF UNCONTROVERTED FACTS..................................................................................1

II.     INTRODUCTION...........................................................................................................................7

III.    FACTS...........................................................................................................................................8

IV.     ARGUMENT................................................................................................................................11

A.      Summary Judgment Standard....................................................................................................11

B.      The Undisputed Evidence Proves That Plaintiff Can Establish a Prima Facia Case of Failure
 to Accommodate Under the ADA................................................................................................13

1.      Plaintiff Is Disabled...................................................................................................................14

2.      Plaintiff Was Qualified For The Hospital Services Technician Position He Desired...............15

i.      The HST Position does not Require a DOT license....................................................................15

C.      Requesting the accommodation was reasonable and plausible and Defendant
failed in its obligation to reasonably accommodate Trinidad.................................................19

1.      It was reasonable for Trinidad to be accommodated to the HST position.............................19

2.      Defendant's Lack Of Accommodation Policy Resulted In Trinidad Having To Compete
For A Reassignment....................................................................................................................19

3.      Defendant Failed To Make Any Actual Effort To Engage In The Interactive Process To Determine
If Plaintiff Could Be Reasonably Accommodated..................................................................21

4.      Defendant decided to fire Plaintiff before ever engaging in an effort to accommodate
him     .........................................................................................................................................24

D.      Defendant Regarded Plaintiff As Disabled And Discriminated Against Him Because Of His
Perceived Disability...................................................................................................................25

1.      Plaintiff is disabled...................................................................................................................26

2.      Plaintiff was otherwise qualified.............................................................................................29

3.      Plaintiff suffered discrimination because of his perceived disability.....................................30

V.      CONCLUSION.............................................................................................................................31

# TABLE OF AUTHORITIES

## Cases

*Adair v. City of Muskogee*, 823 F.3d 1297 (10th Cir. 2016)……………………. ………………27

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)……………………………………12,13

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)……………………………………………11,12,13

*Davidson v. Am. Online, Inc.*, 337 F.3d 1179 (10th Cir.2003)…………………………....15,26

*Dewitt v. S.W. Bell Tel. Co.* (10th Cir. 2017)…………………………………………………....25

*E.E.O.C. v. C.R. Eng., Inc.*, 644 F.3d 1028 (10th Cir. 2011) ……………………………...25,30

*Exby-Stolley v. Bd. of Cty Commrs*, 979 F.3d 784 (10th Cir.)(en banc)…………………………20

*Harte v. Bd. of Comm'rs of Cnty. of Johnson, Kan.*, 864 F.3d 1154 (10th Cir. 2017)…………..12

*Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877 (10th Cir. 2015)…………………...15,25,26

*Justice v. Crown Cork & Seal Co.*, 527 F.3d 1080 (10th Cir. 2008)……………………………25

*Kannady v. City of Kiowa*, 590 F.3d 1161 (10th Cir. 2010)…………………………… ………12

*Lewis v. City of Union City*, 934 F.3d 1169 (11th Cir. 2019)……………………………………28

*McKenzie v. Dovala* , 242 F.3d 967 (10th Cir. 2001)…………………………………………....27

*Neri vs. Bd. of Educ. for Albuquerque Pub.*
*Sc*, 2021 WL 2409988 (D. N.M. June 14, 2021)………………………………………………...28

*Nguyen v. City & Cnty of Denver, Colo*, 286 F. Supp. 3d 1168 (D. Colo. 2017)………………..25

*Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260 at n.6………………………………… ……26

*Plotke v. White*, 405 F.3d 1092 (10th Cir.2005)………………………………… ………...26

*Punt v. Kelly Servs.*, 862 F.3d 1040 (10th Cir. 2017) …………………………………………...13

*Sanchez v. Vilsack*, 695 F.3d 1174 (10th Cir. 2012)……………………………………………13

*Scott v. Harris*, 550 U.S. 372 (2007)……………………………………………………………12

*Silk v. Board of Trustees*, 795 F.3d 698 (7th Cir. 2015)………………………………… ……...28

*Smith v. Midland Brake, Inc.*, 180 F.3d 1154 (10th Cir. 1999) (en banc)………………..14,20,21

*Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976 (10th Cir. 2002)………………………12

## Statutes

42 U.S.C. § 12101, *et. seq.* …………………………………………………………………7,15

42 U.S.C. § 12102……………………………………………………………… ……...14,26,27

42 U.S.C. § 12111………………………………………………………………………15,16,30

42 U.S.C. § 12112………………………………………………………………………8,13,14,25

29 C.F.R. § 1630.2………………………………………………………………………………15,27

ADA Amendment Act of 2008 (ADAAA), 110 P.L. 325, 122 Stat. 3553, *et. seq*…………..passim

# I.    STATEMENT OF UNCONTROVERTED FACTS

Plaintiff's Employment with Defendant

1.    Plaintiff is blind in his left eye.  Dkt No. 46, Pre-Trial Order Stipulated Facts.

2.    Plaintiff was employed as a Customer Service Technician with Defendant for almost 20 years in the Kansas City district location. He began his employment as a Customer Service Technician I (then referred to as a DSR I) on June 1, 1998 and was promoted to Customer Service Technician II (then referred to as a DSR II) effective January 1, 2002.  Dkt No. 46, Pre-Trial Order Stipulated Facts; Ex. 1, Def. Bates No. A00596; Ex. 2, Def. Bates No. A00598.

3.    As a Customer Service Technician Plaintiff's job duties included picking up and delivering medical equipment to hospitals and nursing homes, cleaning and inspecting equipment, performing maintenance, and ordering supplies along with handling receiving and delivering of equipment, among other things. Dkt No. 46, Pre-Trial Order Stipulated Facts.

4.    The job description for the Customer Service Technician position lists the knowledge and physical requirements for the Customer Service Technician to include: 21 years of age or older; high school diploma or equivalent; prior work experience in a hospital setting or customer service preferred; basic computer skills; willing to work flexible hours, including evenings, weekends and holidays, as well as emergency off-hours as required; valid driver's license and potential for DOT certification; able to lift and/or push 75 pounds; able to stand and walk for long periods of time. Ex. 3, Customer Service Technician Job Description

5.    Plaintiff's 2017 performance evaluation rates him as meeting expectations. Ex. 4, Plaintiff's work history, Ex. 5, Plaintiff's 2017 Performance Evaluation.

6.      Trenton Stambaugh, Customer Service Coordinator, was Plaintiff's supervisor from March 1, 2017 to Plaintiff's termination. Stambaugh believed Plaintiff was performing adequately in his job as a Customer Service Technician. Ex. 4, Plaintiff's work history; Ex. 6, Declaration of Trenton Stambaugh.

7.      Doug Lewis, Operations Manager, believed Plaintiff had "vast knowledge of almost 20 years in the industry" and "knew a lot more around the equipment than any of the junior technicians." Ex. 7, Lewis depo. P. 25, lines 15-25, P. 26, lines 1-6.

8.      During Plaintiff's employment, Defendant was aware that Plaintiff is blind in his left eye. Dkt No. 46, Pre-Trial Order Stipulated Facts.

Defendant Transitions to 14-foot trucks requiring the Customer Service Technicians to have a Department of Transportation license

9.      In late 2016 Defendant notified the Kansas City office that it would be transitioning its delivery vehicles to include 14-foot trucks which requires the drivers to have a valid DOT license. Dkt No. 46, Pre-Trial Order Stipulated Facts.

10.     In the Kansas City area office, the first 12-foot truck was replaced by a 14-foot commercial vehicle in April 2017 and the last was replaced in August 2017. Dkt No. 46, Pre-Trial Order Stipulated Facts.

11.     When Plaintiff learned that Defendant was transitioning to DOT trucks, Plaintiff told his manager, Doug Lewis, that he would be unable to obtain a DOT license because he is blind in his left eye. Ex. 7, Lewis depo. P. 39, lines 6-25; P. 40, lines 1-6.

12.     Plaintiff is unable to obtain a DOT license because of being blind in his left eye. Dkt No. 46, Pre-Trial Order Stipulated Facts

13.     When Plaintiff told Lewis that he could not obtain a DOT license, Lewis told Plaintiff that they had time and would try to figure something out. Ex. 7, Lewis depo. P. 40, lines 7-16.

Defendant's Hospital Services Technician position at the University of Kansas

14.     Defendant employs Hospital Service Technicians at the University of Kansas location. Ex. 8, Oparnico depo. P. 20, lines 21-25, P. 21, lines 1-9.

15.     The Hospital Service Technician position has similar job qualifications as the Customer Service Technician position except that it does not require driving or a DOT license and is based in a hospital setting. Ex. 7, Lewis depo. P. 41, lines 2-20.

16.     The job description for the Hospital Service Technician position has the same knowledge and physical requirements as the Customer Service Technician except for requiring a valid driver's license and potential for DOT certification. Ex. 3, Customer Service Technician job description; Ex. 9, Hospital Service Technician job description.

17.     Mike Oparnico was the Operations Manager over the University of Kansas Hospital location in charge of the HST employees at that location in 2016 and 2017 and had hiring authority for the HST positions at that location. Ex. 8, Oparnico depo. P. 10, lines 3-23; Ex. 10, Lang Declaration.

18.     The University of Kansas location had at least 38 positions open from August 2016 to December 2017. Ex. 11, Job Openings for the HST position.

Defendant does not have a written policy that discusses reasonable accommodation for disabled employees.

19.     Defendant has an Equal Employment Opportunity Affirmative Action policy which is the policy that addresses disabled employees.  Although it does have a form to be filled out by a physician to determine the nature of the disability, that process is not discussed in its EEO Affirmative Action policy. Ex. 12, Def. Answers to Pl. Interrogatories Nos. 16, 17; Ex. 13, Equal Employment Opportunity Affirmative Action policy; Ex. 14, Medical Form.

20.     Kristen Dunlap was Defendant's Benefits Manager in 2016 and 2017. Ex. 15, Dunlap depo., P. 7, lines 2-13.

21.     Kristen Dunlap and Trenton Stambaugh were the individuals responsible for managing accommodations for disabled employees, but Dunlap has never seen the medical accommodations form. Ex. 12, Def. Answers to Pl. Interrogatories No. 5; Ex. 15, Dunlap depo., P. 52, lines 10-25, P. 53, lines 1-3.

22.     Plaintiff was never given the medical accommodations form while employed with Defendant. Trinidad depo., Ex. 16, P. 73, lines 2-11.

23.     The Equal Employment Opportunity Affirmative Action policy states that the enforcement of the policy is the responsibility of the chief human resources officer. Ex. 13, EEO Affirmative Action Policy.

24.     Danielle Lang was the Director of Human Resources over Plaintiff in 2016-2017. Ex. 10, Lang Declaration

25.     Lang did not make final decisions on employee terminations or discipline but provided guidance and support as to the best and most appropriate ways to proceed based on company policies and practices. Ex. 10, Lang Declaration.

26.     Defendant's practice was for disabled candidates to apply for internal openings, be contacted by a recruiter for further inquiry and passed on to the hiring manager if the candidate was qualified for the position. Ex. 10, Lang Declaration; Ex 12, Def. Answers to Pl. Interrogatories No. 18; Ex. 17, Reassignment policy.

27.     Lang told Lewis that as part of the follow up discussion with Plaintiff he should inform Trinidad to look at the current Agiliti job postings and apply for any other jobs he saw that were of interest to him and that he was qualified for. Ex. 10, Lang Declaration.

28.     Defendant's policy does not require Defendant to reassign Plaintiff to another position without applying and competing with other employees. Ex. 15, Dunlap depo. P. 37, lines 3-8; Ex. 7, Lewis depo. P. 47, lines 9-13.

29.     The decision to reassign Plaintiff to the Hospital Services Technician position was left up to the hiring manager, Mike Oparnico. Ex. 10, Lang Declaration; Ex. 15, Dunlap depo. P. 36, lines 5-16; Ex. 7, Lewis depo., P. 69, lines 17-24.

<u>Plaintiff requested a reasonable accommodation to be reassigned to the Hospital Services Technician position</u>

30.     When Plaintiff learned he was being terminated from Defendant's employment, he requested to be transferred to the Hospital Services Technician position. Ex. 7, Lewis depo., P. 43, lines 19-25, P. 44, lines 1-18.

31.     Lewis spoke with Oparnico about Trinidad being transferred to the Hospital Services Technician position and told Oparnico that Trinidad was looking for reassignment because he was being terminated because he was unable to get a DOT license. Ex. 8, Oparnico depo, P. 37, lines 2-25, P. 38, lines 1-4.

32.     Oparnico knew Plaintiff was blind in his left eye. Ex. 8, Oparnico depo., P. 16, lines 1-9.

33.     Oparnico did not hire Plaintiff in the Hospital Services Technician position primarily because based on his observation of the way Trinidad breathed and walked, Trinidad was not physically capable of handling the physical nature and fast paced environment of the job. Oparnico believed Trindad to be a chronic smoker and had a lung condition or disease. Oparnico was also afraid that Trinidad would injure himself or have a stroke.  Oparnico did not speak with Trinidad about his concerns. Ex. 8, Oparnico depo., P. 38, lines 5-22, P. 44, lines 7-17, P. 83, lines 5-20, P. 84, lines 13-18.

34.     When Lang spoke with Oparnico about Trinidad transferring to the Hospital Services Technician position Oparnico told Lang that Trinidad would not be a good fit because of the physical nature and fast-paced environment of the job and past performance concerns. Ex. 10, Lang Declaration.

35.     Oparnico did not speak with Trinidad about the Hospital Services Technician position. Ex. 8, Oparnico depo., P. 38, lines 23-25, P. 39, Line 1, P. 44, lines 18-22; Ex. 20, No. 12, Def. Responses to Pl. Request for Admissions.

36.     Lang did not speak with Trinidad about the Hospital Services Technician position. To her knowledge Oparnico did not have any discussions with Trinidad. Ex. 10, Lang Declaration.

37.     Oparnico believes that Trinidad is qualified pursuant to the skill set for the HST position with the except for the physical qualifications. But Oparnico does not know if Trinidad can push and/or lift 75 pounds as required by the Hospital Services Technician job description. Ex. 8, Oparnico depo., P. 22, lines 20-25, P. 23, lines 1-25, P. 24. Line 1, P. 33, lines 9-13.

38.     Lewis did not speak further with Trinidad or Oparnico about the Hospital Services Technician position because he didn't want to "pry for more because I didn't feel that it was within my responsibilities to question he (Oparnico) -- how he runs his program." Ex. 7, Lewis depo., P. 69, lines 17-24.

39.     In October 2017, Alonzo Hullaby, a Customer Service Technician in the Kansas City district, transferred to the Hospital Services Technician position. Hullaby was unable to obtain a DOT license due to citations in his driving record and had disciplinary records in his personnel record. Ex. 7, Lewis depo.,P. 71, lines 10-25; Ex. 6, Stambaugh Declaration; Ex. 18, Alonzo Hullaby personnel records.

40.     Lewis believed Plaintiff could do the HST job. Ex. 7, Lewis depo., P. 81, lines 23-25, P. 82, lines 1-10

41.     Stambaugh believed Plaintiff could do the HST job. In fact, Stambaugh was unaware that Trinidad was being terminated and believed he could be accommodated in the CST position. Ex. 6, Stambaugh Declaration

<u>Plaintiff was terminated from his employment because he was unable to get a DOT license due to his blindness</u>.

42.     On November 20, 2017, Danielle Lang emailed Lewis with talking points for Plaintiff's termination.  Lang suggested that Lewis terminate Plaintiff on November 28, 2017, with his last day being December 11, 2017. Lang's talking points recommended that Lewis tell Plaintiff, "Gary as you are aware our offices, including Kansas City, are converting to more DOT trucks and patient handling business. On February 10th it was communicated that you were unable to complete your DOT certification. If this is still the case we will need to discuss a transition plan out of UHS as the needs of the office are not able to accommodate non DOT drivers with the signing of additional business and on-call requirement" Ex. 19, Lang Email.

43.     On November 28, 2017, Lewis terminated Plaintiff because he was unable to obtain a DOT license telling him that his last day would be December 11, 2017. Dkt No. 46, Pre-Trial Order Stipulated Facts.

## II.     <u>INTRODUCTION</u>

At the heart of this litigation is the scope of protection afforded by the Americans With Disabilities Act as amended by the ADA Amendment Act of 2008, which was passed, among other reasons, to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1); 110 P.L. 325, 122 Stat. 3553. Specifically in the employment context, the statute prohibits discrimination against "a

qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Discrimination against a qualified individual on the basis of a disability includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee" unless that accommodation would impose an undue hardship on the employer. 42 U.S.C. § 12112(b)(5)(A).

The ADA is crystal clear in its prohibition against discrimination and retaliation against employees based on their disabilities. 42 U.S.C. § 12112(a). The statute and regulations are direct and specific on the obligations an employer has to its personnel.  Defendant has not met its obligations to Gary Trinidad.

### III.   FACTS

Gary Trinidad is a displaced, disabled former employer of Agiliti Health. He is blind in his left eye. (SOF, ¶ 1). Mr. Trinidad began his employment with Defendant in 1998 as a Customer Service Technician ("CST"). (SOF ¶ 2). In 2001, he was promoted to the position of Customer Service Technician II and remained in that position until his termination from his employment on December 11, 2017. (SOF ¶ 2, 43). As a CST, Trinidad was responsible for picking up and delivering medical equipment to hospitals and nursing homes, cleaning and inspecting equipment, performing maintenance, and ordering supplies along with handling receiving and delivering of equipment, among other things. (SOF ¶ 3).  Because of his vast knowledge and experience in the industry, he was called upon to train junior employees. (SOF ¶ 7). Trinidad was a competent employee, meeting expectations in his job. (SOF ¶ 5, 6).

In late 2016, Defendant decided to replace its 12-foot trucks with 14-foot box trucks. (SOF ¶ 9). Part of the job duties for a CST was to deliver equipment, which at times required the larger trucks. (SOF ¶ 3). Because Plaintiff is blind in his left eye, he is unable to obtain a DOT license. (SOF ¶ 12). When Plaintiff's Operation Manager, Doug Lewis, told Trinidad that it would be necessary to obtain a DOT license, Trinidad told Lewis that he was unable to qualify for the license due to his blindness. (SOF ¶ 11). Lewis told Plaintiff that they had time and would try to figure something out. (SOF ¶ 13).

Defendant replaced its initial 12-foot trucks with the 14-foot box trucks in April 2017. (SOF ¶ 10). The last 12-foot truck was replaced in August 2017. (SOF ¶ 10). Trinidad continued to be employed as a CST throughout this time. (SOF ¶ 2, 43). On November 20, 2017, Lang emailed Lewis to discuss terminating Trinidad, suggesting that Lewis terminate Trinidad on November 28, 2017, and she provided Lewis with talking points for Trinidad's termination. (SOF ¶ 42). Lang's talking points did not suggest that Lewis discuss what accommodations could be made to Trinidad for him to keep his employment. (SOF ¶ 42). On November 28, 2017, Lewis told Trinidad that he was being terminated from his job effective December 11, 2017, because of his inability to obtain a DOT license. (SOF ¶ 43). Trinidad requested a reasonable accommodation to be reassigned to the Hospital Services Technician ("HST") position at the University of Kansas Hospital location. (SOF ¶ 30).

The HST position is similar to the CST position except it is hospital based and does not require driving. (SOF ¶ 15. The physical and knowledge requirements as listed in job descriptions for the two positions are identical, but for the driving requirement for the CST position. (SOF ¶ 16). Mike Oparnico was the Operations Manager over the University of Kansas location. (SOF ¶17). After Trinidad requested the accommodation to be transferred, Lewis

reached out to Oparnico to tell him that Trinidad was losing his job as a CST due to his inability to be DOT certified and was requesting reassignment to the HST position. (SOF ¶ 31).

Defendant does not have a written policy that specifically discusses reasonable accommodation for disabled employees. (SOF ¶ 19). Kristen Dunlap, Defendant's Benefits Manager during the requisite time frame, and Trent Stambaugh, Defendant's Customer Services Coordinator, were responsible for the reasonable accommodation of disabled employees. (SOF ¶ 20, 21). Although Defendant does have a medical form to be provided to physicians regarding an employee's limitations, Dunlap is unfamiliar with the form and Trinidad was never provided it during his employment. (SOF ¶ 21, 22). Instead, Defendant's management and human resources personnel understand the policy to require the disabled employee to seek positions for which he is qualified, apply for the position and compete with other internal applicants. (SOF ¶ 26, 27, 28). Defendant's accommodation policy does not, therefore, require that an employee be reassigned to a position but instead, be considered for a position, leaving the ultimate decision to the hiring manager for that position. (SOF ¶ 29).

Oparnico was the hiring manager for the HST position to which Trinidad requested reassignment.  (SOF ¶ 17). Oparnico was given the sole authority as to whether Trinidad would be reassigned to the HST position instead of being terminated from his employment due to his disability. (SOF ¶ 29). Oparnico decided against hiring Trinidad. (SOF ¶ 33).

Oparnico primarily denied Trinidad the HST position because, based on his observation of the way Trinidad breathed and walked, Trinidad was not physically capable of handling the physical nature and fast paced environment of the job. Oparnico was also concerned that Trinidad would injure himself or have a stroke (SOF ¶ 33, 34). Oparnico did not speak with Trinidad about his concerns. (SOF ¶ 35).  In fact, Oparnico believed Trinidad met the actual

requirements of the HST position except for the physical requirements but admits that he was actually unaware if Trinidad was able to lift and/or push 75 pounds as required in the HST job description. (SOF ¶ 37). Lewis and Stambaugh, Plaintiff's direct management, did believe that Trinidad could handle the HST job. But under Defendant's policy, they were unable to facilitate an accommodation for Trinidad because Defendant put the decision entirely in the hands of Oparnico. (SOF ¶ 40, 41, 29).

Oparnico did speak with Danielle Lang, the Director of Human Resources over the Kansas City district. (SOF ¶ 34).  Oparnico told Lang that he was not going to hire Trinidad because he did not believe that Trinidad could physically handle the job and because he believed that Trinidad had past performance issues.  (SOF ¶ 34). Lang accepted Oparnico's decision to deny Trinidad a reasonable accommodation and never spoke with Plaintiff about the issue.  (SOF ¶36). On December 11, 2017, Trinidad lost his employment of almost 20 years because of his disability. (SOF ¶43).

On these facts - which are undisputed- plaintiff contends that defendant violated the ADA in two ways: 1) by denying Trinidad a reasonable accommodation to the position of HST if he was in fact unable to perform the essential duties of the CST position and 4) by regarding him as disabled and failing to hire him to the HST position because of the perceived disability.

## IV.   <u>ARGUMENT</u>

### A.  Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When the court applies this standard, it views the evidence and draws reasonable inferences in the light

most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). But the court "need not make unreasonable inferences or adopt one party's version of the facts if the record doesn't support it." *Harte v. Bd. of Comm'rs of Cnty. of Johnson, Kan.*, 864 F.3d 1154, 1173 (10th Cir. 2017). An issue of "material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on the issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And, an issue of fact is "material" if it has the ability to "affect the outcome of the suit under the governing law[.]" *Id.*

The party moving for summary judgment bears the initial burden of showing "the basis for its motion." *Celotex Corp.*, 477 U.S. at 323; *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (explaining that the moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law'" (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)). A summary judgment movant can satisfy this burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325; *see also Kannady*, 590 F.3d at 1169 (explaining that, to meet its summary judgment burden, the moving party "need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim" (citation and internal quotation marks omitted)).

If the moving party satisfies its initial burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (citation and internal quotation marks omitted); *see also Kannady*, 590 F.3d at 1169 ("If the movant carries [the] initial burden, the nonmovant may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries

the burden of proof." (citation and internal quotation marks omitted)). To satisfy this requirement, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324 (citation and internal quotation marks omitted). When deciding whether the parties have shouldered their summary judgment burdens, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

### B. The Undisputed Evidence Proves That Plaintiff Can Establish a Prima Facia Case of Failure to Accommodate Under the ADA

The ADA prohibits employers from discriminating against qualified individuals on the basis of disability in regard to employment application procedures, hiring, advancement, discharge, compensation, training, and other terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a).  Disability cases are now governed by the terms of the ADA Amendment Act of 2008 (ADAAA), which became effective Jan. 1, 2009. 110 P.L. 325, 122 Stat. 3553, 3559 §§1, 8.  To bring a disability claim under the ADAAA, the requirements are just as they were under the ADA. "Discrimination" under the ADA includes failing to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5).

The Tenth Circuit has adopted a modified burden-shifting framework to assess failure to accommodate claims at the summary judgment stage. Under this framework, Plaintiff must make an initial showing that (1) he is disabled, (2) he is "otherwise qualified," and (3) he "requested a plausibly reasonable accommodation." *Punt v. Kelly Servs.*, 862 F.3d 1040, 1050 (10th Cir. 2017) (quoting *Sanchez v. Vilsack*, 695 F.3d 1174, 1177 (10th Cir. 2012).  If Plaintiff satisfies

his burden with respect to his prima facie case, "the burden of production shifts to the employer to present evidence either (1) conclusively rebutting one or more elements of plaintiff's prima facie case or (2) establishing an affirmative defense." *Id.* at 1050 (quoting *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1177 (10th Cir. 1999) (en banc)).

As this modified framework reflects, an employer's failure to provide reasonable accommodation is itself evidence of discrimination, so an employee must only show that the employer refused to provide a reasonable accommodation to make out a prima facie case. *See id.* at 1048 ("[T]he only reason an accommodation is required is because of the disability, and thus the failure to provide a reasonable accommodation to a qualified employee with a disability is inherently 'on the basis of [the] disability,' 42 U.S.C. § 12112(a), regardless of the employer's motivation.").

The undisputed evidence proves that Plaintiff has established a prima facie failure-to-accommodate case. No reasonable jury could find otherwise. Indeed, it would be implausible for Defendant to even argue as much considering that Defendant admitted it relied on Plaintiff's disability to fire him and then Defendant wholeheartedly failed in its legal obligation to provide Plaintiff a reasonable accommodation. Defendant cannot rebut any element of Plaintiff's prima facia case nor is there any valid defense to the discriminatory actions it took against Plaintiff

1. Plaintiff Is Disabled

Defendant admits that Plaintiff is blind in his left eye. (SOF ¶ 1). Plaintiff is thus, a disabled person under the ADAAA in that he suffers from blindness in his left eye which substantially impairs the function of that bodily system. Such limitations are significant impairments in comparison of a normal person. Under the plain language of the statute, Plaintiff has met this prong of his prima facia case. *See*, 42 U.S.C. §12102

2.   <u>Plaintiff Was Qualified For The Hospital Services Technician Position He Desired</u>

To meet the second prong of his prima facia case, Plaintiff must show that he is a qualified individual who, with or without a reasonable accommodation, could perform the essential functions of the employment position that he held or desired. 29 C.F.R. § 1630.2(m); accord 42 U.S.C. § 12111(8); *Hawkins v. Schwan's Home Serv., Inc*., 778 F.3d 877, 883 (10th Cir. 2015). The Tenth Circuit uses a two-step inquiry to determine whether a plaintiff is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired: First, the court determines whether the individual can perform the essential functions of the job. Second, if (but only if) the court concludes that the individual is unable to perform the essential functions of the job, the court determines whether any reasonable accommodation by the employer would enable him to perform those functions. *Davidson v. Am. Online, Inc*., 337 F.3d 1179, 1190 (10th Cir. 2003).

Assuming for the purposes of this motion that Plaintiff was unable to perform the essential functions of the CST position because of his inability to obtain a DOT license, he was, as discussed below, otherwise qualified to perform the HST job had he been provided that accommodation. This Court does not need to reach the second step in evaluating the HST position as the undisputed evidence is that Trinidad was able to perform the essential functions of the HST job without accommodation.

i.   <u>The HST Position does not Require a DOT license</u>

Defendant terminated Plaintiff asserting that he was not qualified to perform the CST position because having a DOT license to drive the larger 14-foot box trucks became an essential function of the CST job. (SOF ¶ 9, 10, 42). In lieu of termination, Plaintiff sought reassignment to the HST position, which had no such requirement. (SOF ¶ 15, 28).

In analyzing job functions, the ADA dictates that consideration "be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. §12111(8). Relying on this guidance from the statute, Defendant's own documents provide the key evidence. The knowledge and physical requirements of the job descriptions state:

| CST Job Requirements | HST Job Requirements |
|---|---|
| <ul><li>21 years or older</li><li>high school diploma or equivalent</li><li>prior work experience in hospital setting</li><li>basic computer skills</li><li>willing to work flexible hours</li><li>able to lift and/or push 75 pounds</li><li>able to stand and walk for long periods of time</li><li>valid driver's license with potential for DOT certification</li></ul> | <ul><li>21 years or older</li><li>high school diploma or equivalent</li><li>prior work experience in a hospital setting</li><li>basic computer skills</li><li>willing to work flexible hours</li><li>able to list and/or push 75 pounds</li><li>able to stand and walk for long periods of time</li></ul> |

Apart from the driving requirement, the requirements for the HST job description are identical to the job description for the CST position that Plaintiff held for almost 20 years until his termination. (SOF ¶16). In fact, Trinidad's skill level and qualifications as a CST were such that Defendant relied on Plaintiff to train other employees. Lewis testified that Trinidad had "vast knowledge of almost 20 years in the industry" and "knew a lot more around the equipment than any of the junior technicians." (SOF ¶ 7).

Further undisputed evidence that Trinidad consistently met the expectations of his job is seen in his job performance evaluations. Trinidad's 2017 annual performance evaluation, given just a few months before his termination, rates him as meeting expectations. (SOF ¶ 5).

Stambaugh confirms Plaintiff was a solid performer, stating that Trinidad "adequately performed his job" and he "did not have issues with his performance".  (SOF ¶ 6). Defendant admits that Trinidad was not terminated for any performance or work concern issues and that the only reason for Plaintiff's termination was his inability to obtain a DOT license due to the blindness in his left eye. (SOF ¶ 42, 43).

The evidence is simply bereft of any evidence that, but for driving a DOT truck, Plaintiff was incapable of performing the essential functions of the CST position. Relying on Defendant's own job descriptions and testimony, it is implausible to believe that Trinidad was not also capable of performing the essential functions of the HST job. Lewis, Plaintiff's Operations Manager unequivocally admits that Plaintiff was capable and qualified to do the HST job.

> Q.      You didn't have any concerns about him doing the HST job?

> A.      No.

(SOF ¶ 40).

Stambaugh agrees stating that:

> ¶11. Gary was able and competent to do every job required of the Customer Service Technician except for driving a DOT truck.

> ¶12. Gary was also capable of handling the Hospital Service Technician job which is similar to the Customer Service Technician job but does not involve driving.

(SOF ¶ 41)

Even Oparnico admits that Plaintiff was qualified for the position but for his misguided and unsupported perception of Plaintiff's physical ability.

Q. To your knowledge, was Gary Trinidad qualified to be an HST?

A. From the skill sets here, the actual requirements listed, to some extent, yes, there are – the abilities to -- or physical requirements are the things that are the things that I'm questioning.

(SOF ¶ 37).

When asked to identify the specific physical requirements he questioned, Oparnico stated he did not believe that Plaintiff was able to physically handle the lifting and walking aspects of the HST job. (SOF ¶ 37). This is absurd and cannot be reasonably considered. Plaintiff was competently handling the same physical requirements in his CST job. Oparnico even admits that he doesn't in fact know if Trinidad could not handle the physical aspects of the job as defined by Defendant in its own job description.

Q. So at least when it came to moving 75 pounds to your knowledge, Gary Trinidad didn't have any issues with moving 70 pounds, did he --75 pounds, did he?

A. Don't know. Can't answer that

(SOF ¶ 37)

But Defendant's own managers do know, and they don't support Oparnico. Lewis admits:

Q. As far as Gary's physical health, did you have any concerns about his ability to be able to do either an -- outside of the DOT license -- just the moving of equipment, delivering, that sort of thing, did you have any concerns with him being able to do the CST job?

A. No. Gary was -- Gary was strong in – in his abilities of moving equipment and delivering, et cetera.

Q. Okay. So you would not have had any concerns about his physical ability to do the HST job?

A. No.

(SOF ¶ 40)

Stambaugh agrees:

18

¶12. Gary was also capable of handling the Hospital Service Technician job which is similar to the Customer Service Technician job but does not involve driving.

(SOF ¶ 41)

Inferences or assumptions about Trinidad's ability to perform the essential functions of the job is not required to determine that Trinidad was qualified for the HST job. The undisputed evidence proves it. Defendant admits it. No reasonable jury could come to a different conclusion.

### C.  Requesting the accommodation was reasonable and plausible and Defendant failed in its obligation to reasonably accommodate Trinidad.

1.  It was reasonable for Trinidad to be accommodated to the HST position

From the time Defendant was aware the DOT trucks would be replacing the existing box trucks there were at least 38 positions open for the HST position in the Kansas City district, yet Plaintiff was not awarded any.  (SOF ¶ 18). One employee, with less tenure than Plaintiff, who was unable to obtain a DOT license because of citations in his driving record and had disciplinary warnings in his file, was unilaterally transferred to the HST position at the University of Kansas location in October 2017. (SOF ¶ 39). But not Plaintiff. Instead, Plaintiff was shown the exit door after almost 20 years of employment without explanation and without being given consideration for a job he was qualified and capable of performing.

2.  Defendant's Lack Of Accommodation Policy Resulted In Trinidad Having To Compete For A Reassignment

Defendant does not have a written policy that specifically discusses accommodations for disabled employees. (SOF ¶ 19).  The sole policy providing guidance for its compliance with the ADA is contained within its Equal Employment Opportunity Affirmative Action policy. (SOF ¶ 19). That policy simply describes Defendant's alleged commitment to providing equal employment opportunities and assigns responsibility of enforcement of its disabilities policy to its human resources officer. (SOF ¶ 23). The policy does not discuss reasonable accommodation.

(SOF ¶ 19). Defendant does have a Request for Medical Information form that is to be filled out by a physician regarding an employee's physical limitations, which represents Defendant's policy for accommodating employees with disabilities. (SOF ¶ 19). Kristen Dunlap, Benefits Manager, and Trent Stambaugh, Plaintiff's supervisor, are responsible for reasonable accommodation for employees with disabilities. (SOF ¶ 21). Dunlap has never seen the Request for Medical Information form. (SOF ¶ 21).

Defendant's lack of policy resulted in Defendant applying a legally deficient practice which required Plaintiff to compete for reassignment. (SOF ¶ 28). Under the ADA, "the employer has an affirmative obligation to make a reasonable accommodation" ***Exby-Stolley v. Bd. of Cty Commrs***, 979 F.3d 784,795 (10th Cir.)(en banc); ***Smith***, 180 F.3d at 1169 (describing the ADA's requirement for employers to make reasonable accommodations as an "unvarnished obligation"). In complete contrast to its legal obligation, Plaintiff was given only the right to be considered. The Tenth Circuit unanimously rejected that proposition. ***See, Smith*** 180 F.3d at 1164-70.  In ***Smith***, the court described the type of actions that Defendant took here as a "hollow promise," acknowledging that if an employer simply had to consider applications for reasonable reassignments, the employer could merely go through the meaningless process of consideration and refuse them in every instance. ***Id., accord, Exby-Stolley,*** 979 F.3d at 802.

Defendant admits its legal failures. Dunlap states:

Q. So moving -- moving Gary -- so there would not have been any requirement to or there would not have been any policy to have simply taken Gary and moved him into the HST role without having to compete with any other employee?

A. I don't believe so.

(SOF ¶ 28)

Lewis confirmed:

Q. Okay. In the conversation with Mr. Mader, tell me what you recall about that conversation.

A. Basically him saying if -- if he's not qualified for the CST role, he would no longer be able to continue employment. His only other option would be to look for something internal, and that's kind of out of our hands. It's really the hiring manager.

Q. Was Mr. Trinidad required to apply, then, for other roles that were of interest to him, or was that something that he would automatically transfer to?

A. No. He was required to apply.

(SOF ¶28)

Reassignment under the ADA means "something more than the mere opportunity to apply for a job with the rest of the world." *Smith*, 180 F.3d at 1164. A disabled employee unable to perform his current position, if reassignment is proper, "has a right in fact to the reassignment." *Id*. at 1166. [T]he word "reassign" must mean more than allowing an employee to apply for a job on the same basis as anyone else. *Id*. This "hollow promise" as described by the court is exactly what occurred to Trinidad. *See, Smith* at 1166. Defendant's actions are a far cry from the affirmative duty it has under the law to reasonably accommodate its displaced, disabled employee. The result was a complete failure of exactly what the ADA is designed to prevent.

3. <u>Defendant Failed To Make Any Actual Effort To Engage In The Interactive Process To Determine If Plaintiff Could Be Reasonably Accommodated.</u>

Defendant's utter failure to engage in any interactive conversation with Plaintiff was as equally deficient as its lack of policy. The interactive process, as the name implies, requires both employee and employer to take some initiative. *Templeton v. Neodata Servs., Inc*., 162 F.3d 617, 619 (10th Cir. 1998) (The federal regulations implementing the ADA envision an interactive process that requires participation by both parties.). The most basic tenet of legally sufficient interactive processes must include conversation between the employee and employer.

*Id*.  The purpose of this process is to ensure that individuals are not discriminated against on the basis of their disability. Here, no such conversation occurred.

Danielle Lang was employed as the Director of Human Resources during this time. (SOF ¶ 24). Ms. Lang's commitment to assure that Trinidad was not being discriminated against due to his disability can best be described as non-existent.  Lang acknowledges that she did not make decisions regarding termination or discipline of employees but provided only support and guidance.  (SOF ¶ 25). Lang's support and guidance in assisting Trinidad's transfer to the HST position included speaking with Oparnico on one occasion about the reassignment and deferring to Oparnico's unsupported opinion that Trinidad could not do the job because it was fast-paced and Plaintiff had alleged prior performance concerns.  (SOF ¶ 34).

Lang admits that she did not speak with Trinidad about the accommodation even knowing that Trinidad was losing his job due to his disability. (SOF ¶ 36, 42). She understood that Oparnico also did not speak with Trinidad about the transfer and did nothing when Oparnico told her Trinidad would not be reassigned to a role he was otherwise qualified for.  (SOF ¶34, 36). Despite being charged with the responsibility of assuring that Defendant's supposed commitment to disabled employees was fulfilled and having a legally affirmative duty to do so, she failed in her duty.

Had Lang engaged in even the slightest effort to comply with her legal obligations to a disabled employee, she could have learned that Plaintiff's direct management staff had no concerns about his ability to perform the HST job. (SOF ¶ 40, 41). Oparnico's concerns about Plaintiff's performance were unjustified.  Other employees with discipline had been transferred to the HST position without issue and Plaintiff was meeting the expectations of his job performance in his annual evaluations. (SOF ¶ 5, 6, 39). Oparnico's unsupported beliefs about

Plaintiff's possible future performance is not an exception to Defendant's obligation to reassign Plaintiff and did not relinquish Lang from her duty under Defendant's EEO policy. Inexcusably, Lang's only affirmative efforts toward Plaintiff did not involve efforts to accommodate Plaintiff, but instead creating talking points to facilitate his termination from his job. (SOF ¶42).

When Trinidad told Lewis that he would not be able to obtain a DOT license, Lewis initially told Trinidad that they had time to figure something out. (SOF ¶ 13). When that time came to an end, Lewis simply left Trinidad to compete for the HST position and washed his hands of any further effort because he didn't want to "pry for more because I didn't feel that it was within my responsibilities to question he (Oparnico) -- how he runs his program." (SOF ¶38). But Lewis is wrong.  It is exactly within his legal responsibilities. The ADA requires that he take affirmative steps to assure that his disabled employees are reasonably accommodated if possible. He did not.

Stambaugh, who was responsible for the accommodation of disabled employees, was left in the dark entirely. ( SOF ¶ 41). In fact, Stambaugh believed it was possible to accommodate Trinidad's inability to drive the DOT trucks by having someone else be on call when a DOT truck was needed.  Stambaugh though, never engaged in any conversation with Plaintiff about accommodations because he, Plaintiff's direct supervisor, was unaware Plaintiff's job was even at risk.  (SOF ¶ 39).

Oparnico, whom Defendant left charged with the responsibility to accommodate Plaintiff in his request for reassignment, never spoke with Plaintiff about the reassignment. (SOF ¶ 35). Oparnico knew that Trinidad was losing his job due to his disability and Plaintiff was requesting reassignment to the HST position.  (SOF ¶ 31). Oparnico denied the accommodation, not because it was unreasonable nor because Plaintiff did not meet the actual job requirements, but

because of unsubstantiated and unproven presumptions he made about Trinidad's health. (SOF ¶ 33). Oparnico never spoke with Plaintiff about his concerns. (SOF ¶ 35). He never spoke with Lewis about his decision. (SOF ¶ 38). He never even really considered Plaintiff's application and denied Plaintiff the accommodation without ever giving him a chance.

There is overwhelming evidence that Defendant failed to sufficiently engage the interactive process to which Defendant cannot deny. Plaintiff has met his burden

4. <u>Defendant decided to fire Plaintiff before ever engaging in an effort to accommodate him</u>

Noteworthy is that Defendant made the decision to terminate Trinidad before ever engaging in any meaningful interactive process.  On November 20, 2017, Lang emailed Lewis providing him talking points for Trinidad's termination.  (SOF ¶ 42). Lang's talking points perfectly illustrate her lackluster efforts to provide equal employment opportunities to disabled employees, stating:

> Gary as you are aware our offices, including Kansas City, are converting to more DOT trucks and patient handling business. On February 10th it was communicated that you were unable to complete your DOT certification. If this is still the case we will need to discuss a transition plan out of UHS as the needs of the office are not able to accommodate non DOT drivers with the signing of additional business and on-call requirements.

(SOF ¶ 42)

Yet Lang's talking points were untrue.  Defendant was able to accommodate non-DOT drivers through reassignment to a non-driving position and had done so before. (SOF ¶ 39). Reassignment to an alternate position as an accommodation is glaring in its omission. It completely defies Defendant's legal duty to Plaintiff. Trinidad was unaware that he was being terminated from his job as a CST until November 28, 2017, twenty days after Lang and Lewis had made the decision to terminate him. (SOF ¶ 42).

Another District Court in the Tenth Circuit considered a failure to accommodate claim where the evidence was similar and held that a reasonable jury could conclude that defendant did not adequately participate in the interactive process and therefore failed to accommodate the plaintiff. *Nguyen v. City & Cnty of Denver, Colo*, 286 F. Supp. 3d 1168, 1188 (D. Colo. 2017). The court in *Nguyen* found the evidence compelling where, before engaging in the interactive process, the defendant had already decided to fire the plaintiff. *Id*. The same holds true here.

The ADA is clear and direct that Defendant's failure to accommodate Plaintiff is a violation of the law and Plaintiff is entitled to Summary Judgment on his claims.

### D.   Defendant Regarded Plaintiff As Disabled And Discriminated Against Him Because Of His Perceived Disability

In what amounts to a one two punch, Defendant discriminated against Plaintiff by failing to accommodate him due to his blindness and then, regarding him as having a completely separate disablity, refused him a position as an HST resulting in the final blow.

The ADAAA prohibits employers from discriminating against "a qualified individual on the basis of disability in regard to . . . discharge of employees." 42 U.S.C. § 12112(a). To make out a prima facie case for discrimination under the ADAAA, Trinidad must show that he "(1) is a disabled person as defined by the ADA; (2) is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) suffered discrimination by an employer or prospective employer because of that disability." *E.E.O.C. v. C.R. Eng., Inc*., 644 F.3d 1028, 1037-38 (10th Cir. 2011) (quoting *Justice v. Crown Cork & Seal Co*., 527 F.3d 1080, 1086 (10th Cir. 2008)). *Dewitt v. S.W. Bell Tel. Co*. (10th Cir. 2017); *Hawkins v. Schwan's Home Serv., Inc*., 778 F.3d 877, 883 (10th Cir. 2015). Because Trinidad contends that Defendant intentionally discriminated against him because Defendant perceived him as disabled, this lawsuit presents a claim of disparate-treatment discrimination. *See*

*Davidson v. Am. Online, Inc*., 337 F.3d 1179, 1189 (10th Cir.2003). The Tenth Circuit has

described the prima facie case for such a claim as "not onerous." *Plotke v. White*, 405 F.3d 1092,

1099 (10th Cir.2005) (internal quotation marks omitted).

The Tenth Circuit has consistently held that when employers expressly admit their

adverse employment actions were taken because of the employee's disability, the employer's

motive is simply not at issue, rendering the *McDonnell Dougla*s framework both unnecessary

and inappropriate. *See, Hawkins, supra*, 778 F.3d at 883 n. 4; *Osborne v. Baxter Healthcare

Corp.*, 798 F.3d 1260 at n.6; *Davidson, supra* at 1189.  Because Defendant expressly admits that

it relied on Trinidad's disability in failing to hire him for the HST position, this is a direct

evidence case.

    1.  <u>Plaintiff is disabled</u>

Disability cases are now governed by the terms of the ADA Amendment Act of 2008

(ADAAA), which became effective Jan. 1, 2009. 110 P.L. 325, 122 Stat. 3553, 3559 §§1, 8.

Under the ADAAA (unlike prior case law), "[t]he definition of disability in this Act shall be

construed in favor of broad coverage of individuals under this Act, to the maximum extent

permitted by the terms of this Act." 42 U.S.C. § 12102(4)(A). Of particular importance is that

Congress added 42 U.S.C. § 12102(3) to clarify the meaning of regarded-as coverage in §

12102(1)(C) and to override the prior restrictive standard that courts had adopted.  The ADA

now provides that an individual meets the ADA's regarded-as definition "if the individual

establishes that he or she has been subjected to an action prohibited under this chapter because of

an actual or perceived physical or mental impairment whether or not the impairment limits or is

perceived to limit a major life activity."  42 U.S.C. § 12102(3)(A) (emphasis added).  *See also

Adair v. City of Muskogee*, 823 F.3d 1297, 1305-06 (10th Cir. 2016).

For his "regarded as" claim, plaintiff must show that (1) he has an actual or perceived impairment, (2) that impairment is neither transitory nor minor, and (3) the employer was aware of and therefore perceived the impairment at the time of the alleged discriminatory action." ***Id***. Except where an impairment is transitory and minor, "an individual is 'regarded as having such an impairment' any time a covered entity takes a prohibited action against the individual because of an actual or perceived impairment, even if the entity asserts, or may or does ultimately establish, a defense to such action." 29 C.F.R. § 1630.2(l)(2). The undisputed evidence establishes that Plaintiff meets each and every requirement for a "regarded as disability."

First, Oparnico's testimony establishes that Defendant perceived that Trinidad had a disability. According to the EEOC's interpretive guidelines, if an individual can show that a potential employer refused to hire him based on "myth, fear, or stereotype," including concerns regarding safety, insurance, liability, and acceptance by co-workers and the public, the individual will satisfy the "regarded as" component of the definition of disability. ***McKenzie v. Dovala***, 242 F.3d 967, 971 (10th Cir. 2001); 29 C.F.R. pt. 1630 app. § 1630.2(l). Evidence that an employer failed to conduct an individualized inquiry can show the employer's concerns were based on "myths, fears, and stereotype." ***Id.***

Oparnico believed Trinidad had physical ailments including lung disease that affected his ability to breathe and that affected his ability to walk for long distances. (SOF ¶ 33). Because of this perception, Oparnico feared that Trinidad would be unable to do the HST job and would get injured. (SOF ¶ 33). Oparnico also feared that Trinidad might have a stroke at the workplace because he understood that Trinidad had suffered from a prior stroke. (SOF ¶ 33).

In similar circumstances, the Tenth Circuit has found a Plaintiff satisfies the regarded as claim. In ***Neri vs. Bd. of Educ. for Albuquerque Pub. Sc***, No. 19-CV-00008-JCH-

SCY, 2021 WL 2409988 (D. N.M. June 14, 2021), the Plaintiff alleged disability discrimination against her employer and supervisor, Cynthia Hoppman. The Court found that Defendants regarded Neri as disabled because she had been diagnosed with PTSD and Hoppman's description of Neri's condition as "chronic" was evidence that the condition was not transitory. *Id*. at *5. Hoppman's statement that she did not want to "trigger her PTSD in the future" as explanation for Neri's transfer was further evidence that Hoppman knew of and perceived Mrs. Neri's PTSD at the time of the transfer. Thus, the Court found that Neri had established each requirement to be regarded as disabled. *Id*.

Same here, Oparnico described Trinidad as a chronic chain smoker whose diminished lung capacity was obvious. (SOF ¶ 33).  Oparnico's statement that he did not hire Trinidad for the HST position primarily because his assessment of Plaintiff's health and that he was afraid Plaintiff might get injured or have a stroke is indefensible evidence that Oparnico actions were because of Plaintiff's perceived disability.  (SOF ¶ 33).

Other circuit courts have also found the same when addressing similar situations.  *See Lewis v. City of Union City*, 934 F.3d 1169, 1181-1182 (11th Cir. 2019)(fear that plaintiff might suffer a heart attack sufficient evidence of a regarded as claim because it is a common sense principle that an employer that takes an adverse action because it fears the consequences of an employee's medical condition has regarded that employee as disabled.) *Id*. at 1182.  S*ee also Silk v. Board of Trustees*, 795 F.3d 698, 702, 708 (7th Cir. 2015)(defendant's belief that plaintiff wasn't physically capable of handling job duties sufficient evidence that defendant's actions were based on perceived impairment).  This case is no different.

Second, Defendant's perception that Plaintiff suffered from a lung disease and was unable to walk for long periods of time are not transitory or minor ailments. The undisputed

evidence shows that Defendant did not see Plaintiff's alleged disability as "transitory and minor." See § 12012(3)(B) (stating that "transitory" means the impairment has "an actual or expected duration of 6 months or less").  Oparnico stated: "As long as I knew Gary he was a chain smoker from the time I hired him. So again, 25 years or 20 years of experience observing his operation or his habits, you know, led me to that conclusion. (SOF ¶ 33). In Defendant's eyes, Trinidad's walking and breathing disability had been ongoing for 20-25 years.

Third, Oparnico admits that he relied on the perceived physical disability in denying Plaintiff the HST position.

Q. When you say you told him no, why did you tell him no? Was there not a position open?

A. One, it was due to knowing there was open disciplinary action; and two, you know, more primarily, my assessment of Gary was not physically able to do the demands of the job. My concern was more about his personal health. You know, I didn't want him to get hurt knowing, you know, the exact physical toll that it would take on -- he would take on for that. It was physically challenging for me at the time and I was young. I would consider myself healthy. And, you know, for him, knowing that he was a chain smoker, you know, physically, you know, got tired out simply walking and you could visibly observe him huffing and puffing over short distances, that and there was, you know, my assessment he was not physically able to meet the demands of the job.

(SOF ¶ 33)

Oparnico's admission dooms Defendant.  There is no contradictory evidence that Defendant can put forth.

2.  Plaintiff was otherwise qualified

For the second prong of Plaintiff's prima facia case of disability discrimination, he must show that he was otherwise qualified for the position. The ADAAA defines a "qualified individual" as a person "who, with or without reasonable accommodation, can perform the essential functions of the employment position that [he] holds or desires." 42 U.S.C. § 12111(8).

Because this is a direct evidence case, the only defense available to Defendant is that plaintiff was not otherwise qualified for the position, with or without reasonable accommodation. Defendant cannot defend its actions on that ground because Defendant's own admissions prove otherwise. Plaintiff has thoroughly discussed his qualifications in Section B,2 above and will not reiterate them here but refers this Court to those arguments.  Suffice it to say that the undisputed evidence proves that Plaintiff was qualified for the position of HST.

> 3.  <u>Plaintiff suffered discrimination because of his perceived disability</u>

For the final prong of his prima facia case, Plaintiff must show he suffered discrimination by an employer or prospective employer because of that disability. ***E.E.O.C. v. C.R. Eng., Inc., supra***, at 1037-38. This fact is not in dispute nor is there any argument otherwise. Plaintiff was not hired to the HST position. Oparnico's admissions cement Plaintiff's claim that he suffered discrimination by Defendant because of the perceived disability. (SOF ¶ 33). There is no other interpretation of what occurred at Trinidad's workplace.

There is no dispute as to the material facts presented in this Motion. Rather, the issue presented is a legal question only. This Court must decide if Defendant's actions as outlined above violated its specific and affirmative duties under the law.  Trinidad has unequivocally proven his prima facia case of discrimination. This case is clear-cut example of blatant discrimination against a disabled individual. There is no alternate interpretation and no available defense to the evidence in front of this Court. The evidence in this case is exactly what the ADAAA is intended to protect against. No reasonable juror could find otherwise. This Court should find that Defendant failed to meet its obligations to Trinidad under the law and enter judgment against Defendant for Plaintiff's claims of disability discrimination.

## V. **CONCLUSION**

For the foregoing reasons, Plaintiff Trinidad prays that this Court grant his Motion for

Summary Judgment of his claims of disability discrimination and allow him to proceed to a jury

trial on the issue of damages under the ADA only and on his claims of discrimination under the

ADEA.

Respectfully submitted,

/s/   Dennis E. Egan
Dennis E. Egan, Mo. Bar # 27449
THE POPHAM LAW FIRM, P.C.
712 Broadway, Suite 100
Kansas City, MO  64105
Telephone: (816) 221-2288
Facsimile: (816) 221-3999
E-Mail: degan@pophamlaw.com

By: /s/ *Tiffany B. Klosener*
Tiffany B. Klosener, MO Bar #47078
4600 Madison Avenue, Suite 810
Kansas City, Missouri 64112
Telephone: 816.283.8738
Facsimile: 816.283.8739
Email: tklosener@hslawllc.com

ATTORNEYS FOR PLAINTIFF

## **CERTIFICATE OF SERVICE**

Service of the foregoing was effected via electronic transmission through the District

Court's ECF filing system this 30th day of July, 2021 to all counsel of record.

/s/ Tiffany B. Klosener
Attorney for Plaintiff