## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

GARY TRINIDAD,

          Plaintiff,

v.

AGILITI HEALTH, INC.,
f/k/a Universal Health Systems, Inc.,

          Defendant.

Case No. 19-2683-DDC

## MEMORANDUM AND ORDER

Plaintiff Gary Trinidad worked as a Customer Service Technician (CST) for defendant Agiliti[1] for nearly 20 years.  In late 2016, defendant announced plans to transition its fleet of trucks from 12-foot trucks to 14-foot trucks.  The 14-foot trucks required a Department of Transportation (DOT) license and plaintiff, who was born blind in his left eye, doesn't qualify for a DOT license.  Defendant knew about plaintiff's disability and told plaintiff they'd work something out before it replaced its fleet of trucks.  But on November 28, 2017, with all the 12-foot trucks replaced, defendant informed plaintiff it was terminating his employment in two weeks because plaintiff didn't qualify for a DOT license.  Plaintiff requested that defendant reassign him to the Hospital Service Technician (HST) position—a job that didn't require driving.  Defendant's Operations Manager consulted with the HST Operations Manager, but the HST Operations Manager didn't think plaintiff could handle the physical demands of the HST

---

[1]     Plaintiff's employer participated in several acquisitions, mergers, and name changes over the years. *See* Doc. 46 at 9 (Pretrial Order ¶ 3.b.).  For simplicity, the court refers to plaintiff's employer as "Agiliti" because that's its current name.

job.  With no accommodation in place, defendant terminated plaintiff's employment because he couldn't qualify for a DOT license.

Now, plaintiff sues defendant under the Americans with Disabilities Act (ADA)[2] and the Age Discrimination in Employment Act (ADEA), arguing defendant discriminated against him based on disability and his age.  Plaintiff moved for summary judgment on plaintiff's ADA claim (Doc. 48).  Then, defendant moved for summary judgment on both claims (Doc. 58).

The court denies plaintiff and defendant's Motions for Summary Judgment.  The court explains these decisions, below.

## I.     Factual Background

Plaintiff worked for defendant for nearly 20 years.  *See* Doc. 49-2 at 2 (Pl.'s Ex. 1).  Defendant is a hospital management company.  Plaintiff worked as a Customer Service Technician in defendant's Kansas City location.  Doc. 46 at 2 (Pretrial Order ¶ 2.a.ii.).  The job duties of a CST included, among other things, picking up and delivering medical equipment to hospitals and nursing homes, cleaning and inspecting equipment, performing maintenance, ordering supplies, and handling receipt and delivery of equipment.  *Id.* (Pretrial Order ¶ 2.a.iii.).  CSTs also were required to work on-call.  Doc. 59-2 at 4 (Lewis Dep. 28:5–20).

Plaintiff's last annual performance review, in 2017, rated plaintiff's performance as "Meets Expectations."  Doc. 49-5 at 5 (Pl.'s Ex. 4); Doc. 49-6 at 2 (Pl.'s Ex. 5).  Defendant's records show that on October 27, 2017, defendant gave plaintiff a verbal warning about delegating tasks, communication, and personal hygiene.  Doc. 63-6 at 1–2 (Def.'s Ex. F); Doc.

---

[2]      Plaintiff seeks relief under the ADA.  *See* Doc. 46 at 2 (Pretrial Order ¶ 1.d.).  The court construes the action as one under the ADA, as amended by the ADA Amendments Act of 2008 (ADAAA), and relies on that governing version of the ADA when ruling the pending motions.  *See Skerce v. Torgeson Elec. Co.*, 852 F. App'x 357, 361–62 (10th Cir. 2021) (discussing *Adair v. City of Muskogee*, 823 F.3d 1297, 1304 (10th Cir. 2016)).

49-5 at 6 (Pl.'s Ex. 4).  But plaintiff doesn't recall receiving a verbal warning, and his manager at the time, Trent Stambaugh, doesn't recall disciplining plaintiff.  Doc. 65-2 at 6 (Pl.'s Dep. 94:8–96:5); Doc. 49-7 at 2 (Stambaugh Decl. ¶ 6).

### *Defendant Transitions to Trucks Requiring DOT License*

In late 2016, defendant notified staff that it planned to replace its 12-foot box trucks with 14-foot trucks.  Doc. 46 at 2 (Pretrial Order ¶ 2.a.iv.).  The 14-foot trucks required a United States Department of Transportation (DOT) license to operate.  *Id.*  In the Kansas City office, defendant replaced the first 12-foot truck with a 14-foot truck in April 2017, and it replaced the last 12-foot truck during August 2017.  Doc. 46 at 2 (Pretrial Order ¶ 2.a.v.).  Defendant also maintained smaller transit vans that required no DOT license.  Doc. 64-8 at 11 (Lewis Dep. 94:23–95:19).

Plaintiff is blind in his left eye.  Doc. 46 at 3 (Pretrial Order ¶ 2.a.vi.).  Defendant knew about plaintiff's blindness.  Doc. 49-8 at 4 (Lewis Dep. 38:1–8); Doc. 49-9 at 4 (Oparnico Dep. 16:1–9); Doc. 49-11 at 3 (Lang Decl. ¶ 7); Doc. 59-5 at 13 (Pl.'s Dep. 115:6–13).  Because plaintiff is blind in his left eye, he doesn't qualify for a DOT license.  Doc. 46 at 3 (Pretrial Order ¶ 2.a.vii.).  Thus, plaintiff couldn't drive defendant's new 14-foot trucks.  *Id.* (Pretrial Order ¶ 2.a.viii.).  Operations Manager Doug Lewis, who supervised all CSTs, told the CSTs at a staff meeting that "anybody [who] didn't meet the physical requirements to obtain DOT certification couldn't continue to be a CST."  Doc. 59-2 at 2, 5 (Lewis Dep. 7:16–25, 38:9–25).

Plaintiff knew he didn't qualify for a DOT license, so he told Lewis that he couldn't secure a DOT license because of his disability.  Doc. 59-5 at 8–9 (Pl.'s Dep. 47:20–48:13); Doc. 49-8 at 4 (Lewis Dep. 39:17–40:6).  When plaintiff initially told Lewis he didn't qualify for a DOT license, Lewis responded that they had time to figure out next steps.  Doc. 59-2 at 6 (Lewis

Dep. 40:2–16).  Once Lewis had time to figure out the next steps, Lewis told plaintiff "that there were still other opportunities within the organization, that if he was interested in . . . filling another role, that he had the capability to apply internally."  Doc. 49-8 at 4–5 (Lewis Dep. 40:17–41:1).  Specifically, Lewis suggested the Hospital Service Technician (HST) role for plaintiff and he "brought up HST multiple times."  *Id.* at 5 (Lewis Dep. 41:2–20, 43:2–18).

### CST v. HST

Defendant employs HSTs onsite at the University of Kansas Medical Center (KUMC). *Id.* at 5 (Lewis Dep. 41:2–20); Doc. 49-9 at 5–6 (Oparnico Dep. 20:21–21:9).  Lewis testified that the HST position is similar to plaintiff's CST position—HSTs "do the cleaning, inspection, preparation, delivery, and pick up of all medical equipment within the facility."  Doc. 49-8 at 5 (Lewis Dep. 41:10–14).  But, the HST position doesn't require driving because its job functions are located within the hospital.  So, as one would expect, the HST position doesn't require a DOT license.  Doc. 59-3 at 7 (Dunlap Dep. 1–22); Doc. 64-8 at 5 (Lewis Dep. 41:2–20).

Defendant's job postings manifest this difference between the CST and HST positions. Defendant listed the following requirements in a job description for the CST position:

- 21 years of age or older, with high school diploma or equivalent.

- Prior work experience in hospital setting or customer service preferred.

- Basic computer skills.

- Willing to work flexible hours, including evenings, weekends and holidays, as well as emergency off-hours as required.

- Valid driver's license and potential for DOT certification.

- Able to lift and/or push 75 pounds.

- Able to stand and walk for long periods of time.

Doc. 49-4 at 2 (Pl.'s Ex. 3).  In contrast, according to defendant's job description, the HST

position requires:

- High school diploma or equivalent.

- Prior work experience in hospital setting or customer service preferred.

- Basic computer skills.

- Willing to work flexible hours, including evenings, weekends and holidays, as well as

  emergency off-hours as required.

- Able to lift and/or push 75 pounds.

- Able to stand and walk for long periods of time.

Doc. 49-10 at 2 (Pl.'s Ex. 9).

Because he was unable to procure a DOT license, plaintiff needed an accommodation—

such as reassignment to the HST position—to remain employed by defendant.

### *Defendant's Reassignment Process*

Kristen Dunlap, defendant's Benefits Manager, testified that defendant's accommodation

policy depended on the "entry point."  Doc. 63-1 at 2 (Dunlap Dep. 27:4–11).[3]  Danielle Lang,

defendant's Director of Human Resources, declared that defendant's practice for "disabled

candidates" required a candidate to apply for internal openings, then a recruiter would contact a

candidate, and, if the candidate was qualified, defendant would pass the candidate to a hiring

manager for an interview.  Doc. 49-11 at 4 (Lang Decl. ¶ 13).  According to Dunlap, plaintiff, as

an internal candidate, would enjoy a "priority," and the hiring manager would decide who to

hire.  Doc. 59-3 at 6 (Dunlap Dep. 32:1–23); Doc. 63-1 at 4–5 (Dunlap Dep. 36:16–37:2).

---

[3]       Defendant also cited pages 24 and 25 of Dunlap's deposition.  Doc. 63 at 4.  But defendant's
cited exhibit does not include those pages.  *See generally* Doc. 63-1.

Critically, defendant's policy for current employees seeking transfer or reassignment within the company required the employee to "complete an Internal Job Application."  Doc. 49-13 at 8 (Def.'s Answer to Pl.'s Interrog. 18); Doc. 49-18 (Pl.'s Ex. 17); Doc. 63-1 at 3 (Dunlap Dep. 31:13–25).  So, if plaintiff sought an HST position, defendant's policy required him to apply.[4]  Doc. 49-8 at 6 (Lewis Dep. 47:9–13); Doc. 49-16 at 5 (Dunlap Dep. 37:3–8).  Plaintiff here never applied.  Doc. 63-2 at 3, 4 (Pl.'s Dep. 74:4–16, 115:18–21).

### Defendant Terminates Plaintiff's Employment, So Plaintiff Requests Reassignment

Lewis testified that he had "probably 8 to 10 conversations in total" with plaintiff about plaintiff's employment future with defendant, including the possibility of an HST position.[5]  Doc. 63-3 at 7 (Lewis Dep. 98:5–12).  Lewis testified that when he first suggested the HST role to plaintiff, plaintiff "was rather dismissive at that point in time, . . . he wasn't considering HST initially."  Doc. 59-2 at 9 (Lewis Dep. 45:3–22).

On November 20, 2017, Lang e-mailed Lewis talking points for him to use when he terminated plaintiff.  Doc. 49-20 at 2 (Pl.'s Ex. 19).  Lang recommended that Lewis tell plaintiff "on Tuesday November 28th that his final day . . . would be Tuesday December 12th."  *Id.*  And Lang recommended Lewis tell plaintiff,

> Gary as you are aware our offices, including Kansas City, are converting to more DOT trucks and patient handling business.  On February 10th it was communicated

---

[4]      Defendant asserts that when "management and HR are unable to find an accommodation that allows an employee to stay in their current positions, they *direct* the employee to other internal positions they are qualified for as an accommodation."  Doc. 59 at 4 (emphasis added).  Defendant cites Lewis's testimony and Dunlap's testimony to support this statement.  But Lewis's cited testimony merely recites that he discussed accommodating plaintiff in the CST role with "the director and HR business partner[.]"  Doc. 59-2 at 17 (Lewis Dep. 101:6–19).  And Dunlap's cited testimony explains that, when one potential job didn't work out as an accommodation, "the next step would be to look and see if there were open positions coming up and something that would work that [plaintiff] could potentially transition to[.]"  Doc. 59-3 at 5 (Dunlap Dep. 31:13–20).  So, defendant's cited authority doesn't support defendant's statement that management and HR *direct* an employee to apply to other internal positions.

[5]      Lewis doesn't explain, and the record doesn't clarify, when these conversations occurred.

that you were unable to complete your DOT certification.  If this is still the case we will need to discuss a transition plan out of [defendant] as the needs of the office are not able to accommodate non DOT drivers with the signing of additional business and on-call requirements.

*Id.*  As suggested in the talking points, Lewis informed plaintiff on November 28 that defendant was terminating his employment.  The termination would occur in two weeks because plaintiff couldn't secure a DOT license.  Doc. 46 at 3 (Pretrial Order ¶ 2.a.ix.).

When plaintiff learned defendant planned to terminate his employment, he requested to Lewis that defendant reassign him to the HST role.  Doc. 49-8 at 5 (Lewis Dep. 43:19–44:15); Doc. 63-3 at 4 (Lewis Dep. 56:5–17).  This was plaintiff's first request for reassignment.  Doc. 59-2 at 7–8 (Lewis Dep. 43:19–44:18); Doc. 59-5 at 14 (Pl.'s Dep. 116:12–17).  When plaintiff requested reassignment, Lewis volunteered to talk to Mike Oparnico, who oversaw the HST position, for plaintiff.  Lewis suggested "it would be good for [plaintiff] to talk to Mike [Oparnico] as well."  Doc. 59-2 at 12–13 (Lewis Dep. 64:15–65:15).  Lewis also suggested that plaintiff shadow the HST position.  *Id.*  And Lewis testified that he "told [plaintiff] if he was interested in applying [to the HST position] to apply . . . directly through the system to Mike [Oparnico].  And from there I didn't really have any . . . part in the process[.]"  *Id.*

Given plaintiff's reassignment request, Lewis and Lang discussed the possibility of plaintiff working as an HST at the KUMC location.  Doc. 49-11 at 3 (Lang Decl. ¶ 11).  In 2016 and 2017, Mike Oparnico managed defendant's KUMC site as Operation Manager.  Doc. 49-9 at 3 (Oparnico Dep. 10:3–23).  Oparnico hired and managed the HSTs.  *Id.*  In 2017, defendant hired 32 HSTs at its KUMC location.  *See* Doc. 49-12 at 2–8 (Pl.'s Ex. 11).  Defendant had vacant HST positions.[6]  Doc. 64-2 at 6 (Pl.'s Dep. 55:9–24); Doc. 64-8 at 5 (Lewis Dep. 43:19–

---

[6]      Defendant asserts that there wasn't an open HST position for plaintiff between November 28, 2017 and December 11, 2017.  Doc. 59 at 8; Doc. 63 at 6.  But the evidence defendant cites for this proposition can't support this statement.

44:15); *see also* Doc. 49-12 at 2, 5, 6 (Pl.'s Ex. 11) (showing defendant hired HSTs around

November 28, 2017:  specifically, it hired HSTs on November 6, 2017, November 7, 2017,

November 13, 2017, November 20, 2017, November 27, 2017, December 4, 2017, and February

12, 2018).  In October 2017, Alonzo Hullaby, a CST, applied to the HST position when he was

unable to procure a DOT license due to driving citations.  Doc. 49-8 at 7 (Lewis Dep. 71:10–

72:3); Doc. 49-9 at 3 (Pl.'s Ex. 18).  Defendant transferred Hullaby to the HST position.  *Id.*

Lang spoke with Oparnico about plaintiff applying to become an HST at the KUMC

location.  Doc. 49-11 at 3 (Lang Decl. ¶ 12).  Oparnico knew plaintiff—he had hired plaintiff

initially, managed plaintiff for a period, and worked with him for years.  Doc. 59-4 at 2–3

(Oparnico Dep. 11:11–12:25).  But Oparnico told Lang no, he didn't think plaintiff could

perform as an HST.  According to Lang, "Oparnico stated he did not believe that [plaintiff]

---

*First*, defendant cites its policy about internal job applications.  Doc. 63 at 6 (citing Doc. 63-4
(Ex. D)).  *Second*, defendant cites Lewis's deposition testimony, where Lewis says he didn't
accommodate plaintiff's lack of DOT certification with a prior accommodation used when plaintiff
required FMLA leave.  *Id.* (citing Doc. 63-3 (Ex. C)).  Neither of these pieces of evidence has anything to
do with HST vacancies.  *Third*, defendant cites plaintiff's testimony that describes his conversation with
Lewis about keeping his job.  Doc. 59 at 8 (citing Doc. 59-5 (Ex. E)); Doc. 63 at 6 (citing Doc. 63-2 (Ex.
B)).  Specifically, plaintiff testified:  "And then the next day [Lewis] got back to me and said, no, we
don't have anything available at all.  They're not going to accommodate you."  Doc. 65-2 at 3 (Pl.'s Dep.
40:15–41:1).  This testimony responded to a question about plaintiff accessing defendant's hot line.  And,
given that defendant didn't accommodate plaintiff, plaintiff's statement that there isn't anything available
doesn't prove there were no HST vacancies.  Indeed, plaintiff later responded to a direct question about
vacancies and testified that he was aware of a vacancy at the HST position in December 2017.  Doc. 65-2
at 4 (Pl.'s Dep. 55:9–24).  So, based on plaintiff's testimony, a reasonable factfinder could find or infer
that an HST vacancy existed.

*Last*, defendant cites Oparnico's deposition testimony explaining that Lewis "was inquiring if
there was potentially a position that [plaintiff] could transfer into at KU" and Oparnico told Lewis no.
Doc. 59 at 8 (citing Doc. 59-4 (Ex. D)); Doc. 63 at 6 (citing Doc. 63-5 (Ex. E)).  But Oparnico's
testimony, in context, doesn't establish as undisputed fact that there weren't any vacancies.  Oparnico
explained he told Lewis "no" because Oparnico believed there was an open disciplinary action and that
plaintiff couldn't handle the physical requirements of the job.  *See* Doc. 49-9 at 8 (Oparnico Dep. 37:12–
38:22).  Thus, the court rejects defendant's assertion that it's undisputed that there weren't any HST
vacancies at the time defendant terminated plaintiff's employment.

would be a good fit for the job due to the physical nature and fast paced environment of the job and prior performance concerns."  Doc. 49-11 at 3–4 (Lang Decl. ¶ 12).

Lewis also spoke with Oparnico about plaintiff's potential transfer.  Doc. 49-9 at 8 (Oparnico Dep. 37:6–20); Doc. 59-2 at 12–13 (Lewis Dep. 64:15–65:15).  Lewis believed plaintiff could do the HST job.  Doc. 49-8 at 8 (Lewis Dep. 81:23–82:10).  Nonetheless, Oparnico told Lewis no, he wasn't interested in plaintiff becoming an HST at KUMC.  Doc. 49-9 at 8 (Oparnico Dep. 37:12–21).  Oparnico explained:

> One, it was due to knowing there was open disciplinary action;[7] and two, . . . more primarily, my assessment of [plaintiff] was [that he was] not physically able to do the demands of the job.  My concern was more about his personal health.  You know, I didn't want him to get hurt knowing . . . the exact physical toll that . . . he would take on for that.  It was physically challenging for me at the time and I was young.  I would consider myself healthy.  And, . . . for him, knowing that he was a chain smoker, [and] physically . . . got tired out simply walking and you could visibly observe him huffing and puffing over short distances, that and there was . . . my assessment he was not physically able to meet the demands of the job.

*Id.* (Oparnico Dep. 38:5–22).  Oparnico based his assessment on his own observations.  *Id.* at 10 (Oparnico Dep. 83:5–84:12).  Oparnico also testified plaintiff had experienced a stroke and he was concerned plaintiff would have another one.  *Id.* at 9 (Oparnico Dep. 44:1–17).  Specific to the HST position requirements, Oparnico questioned whether plaintiff could lift or push 75 pounds, but Oparnico also conceded that he didn't know whether plaintiff could move 75 pounds.  *Id.* at 6, 7 (Oparnico Dep. 22:20–24:25, 33:9–13).  And, Oparnico didn't know that plaintiff was unable to procure a DOT license.  Doc. 64-9 at 5 (Oparnico Dep. 19:11–20:9).

After Oparnico told Lewis no, Lewis didn't pry.  Doc. 49-8 at 7 (Lewis Dep. 69:17–24).  He followed up with plaintiff the next day and informed plaintiff, "[W]e don't have anything

---

[7]      The summary judgment record doesn't establish the "open disciplinary action" referenced by Oparnico's testimony.

available at all.  They're not going to accommodate you."  Doc. 65-2 at 3 (Pl.'s Dep. 40:15–41:1).  Neither Oparnico nor Lang spoke directly with plaintiff about the HST position.  Doc. 49-9 at 8, 9 (Oparnico Dep. 38:23–39:1, 44:18–22); Doc. 49-11 at 3–4 (Lang Decl. ¶ 12).  Lang declared that, after Oparnico said no, she "instructed Mr. Lewis that as part of the follow up discussion with [plaintiff] he should inform him to look at the current Agiliti job postings and apply for any other jobs he saw that were of interest to him and he would be qualified for."  Doc. 49-11 at 4 (Lang Decl. ¶ 15).

### Accommodations Within the CST Role

Lewis testified that defendant previously had provided Family and Medical Leave Act (FMLA) accommodations to plaintiff while he worked as a CST.[8]  Doc. 63-3 at 2 (Lewis Dep. 27:3–12); *see generally* Doc. 64-12 (Pl.'s Ex. 11).  Plaintiff couldn't perform on-call duties because he couldn't drive at night or on weekends, so Operations Manager Lewis and other CSTs covered plaintiff's on-call shifts.  Doc. 63-3 at 2 (Lewis Dep. 27:19–25); Doc. 65-1 at 7 (Lewis Dep. 54:9–21).  This accommodation ended when plaintiff returned from FMLA leave.  Doc. 65-1 at 7 (Lewis Dep. 54:22–24).

Lewis testified that this accommodation—having others complete plaintiff's on-call duties—wasn't considered as an option to accommodate plaintiff's inability to secure a DOT license.  *Id.* at 7, 8 (Lewis Dep. 55:16–56:4, 58:13–16).  Lewis also testified that he didn't think defendant could accommodate plaintiff in the CST role because a DOT license was an essential function of the CST position.  *Id.* at 8 (Lewis Dep. 57:21–58:5); Doc. 63-3 at 8 (Lewis Dep.

---

[8]    Defendant asserts that Lewis and Dunlap worked to accommodate plaintiff during his time as a CST.  Doc. 59 at 4.  But Dunlap testified that she wasn't sure whether defendant had accommodated the FMLA request.  Doc. 59-3 at 9 (Dunlap Dep. 47:4–8).  The summary judgment record shows that defendant accommodated plaintiff's FMLA request, but the record doesn't show that Dunlap was involved in that accommodation.

100:1–100:9).  Indeed, when asked if an office-based position existed where plaintiff could perform all the CST tasks except driving, Lewis testified that "there were no existing roles like that" and "our revenue didn't warrant adding a new position under a different job title or job description."  Doc. 59-2 at 16–17 (Lewis Dep. 100:16–101:19).  Moreover, Lang declared that she and Lewis discussed the CST duties and they "determined that driving was an essential component of the Customer Service Technician job."  Doc. 49-11 at 3 (Lang Decl. ¶ 9).  But Stambaugh, plaintiff's manager, declared that he could have accommodated plaintiff in the CST position.  Doc. 64-7 at 4 (Stambaugh Decl. ¶ 15).  Stambaugh wasn't aware that plaintiff's job was in jeopardy and he wasn't consulted on the decision to terminate plaintiff's employment.  *Id.* at 1 (Stambaugh Decl. ¶¶ 4, 5).

Defendant terminated plaintiff's employment on December 11, 2017.  Doc. 46 at 2 (Pretrial Order ¶ 2.a.i.).  Defendant terminated his employment because he couldn't procure a DOT license, and plaintiff couldn't procure a DOT license because he's blind in one eye.  Doc. 59-5 at 6–7 (Pl.'s Dep. 42:11–43:14); Doc. 46 at 3 (Pretrial Order ¶ 2.a.ix.).

### *Defendant's Discrimination Policies*

Defendant maintained an "Equal Employment Opportunity Affirmative Action" policy that describes its "commitment to providing equal employment opportunities."  Doc. 49-14 at 2 (Pl.'s Ex. 13).  The policy provided that defendant "engages in affirmative action to employ, advance in employment and otherwise treat qualified disabled persons . . . without discrimination based upon their disability . . . in all employment practices[.]"  *Id.*  This policy assigned defendant's Chief Human Resources Officer to administer and enforce the "Disability Affirmative Action Program."  *Id.*

Defendant maintained a form, which it called, "Request for Medical Information Physician Questionnaire." This form represented defendant's policy for accommodating disabled employees. Doc. 49-13 at 8 (Def.'s Answer to Pl.'s Interrog. 17); Doc. 49-15 (Pl.'s Ex. 14). This form asked the employee's physician to provide defendant with information about an employee's medical condition, related restrictions, and possible accommodations. Doc. 49-15 (Pl.'s Ex. 14). Defendant's Equal Employment Opportunity Affirmative Action policy doesn't discuss the Request for Medical Information Physician Questionnaire. *See* Doc. 49-14 (Pl.'s Ex. 13). Kristen Dunlap, defendant's Benefits Manager during the relevant time period, testified that she was unfamiliar with defendant's Request for Medical Information Physician Questionnaire. Doc. 49-16 at 3, 6–7 (Dunlap Dep. 6:20–22, 52:10–53:3). Defendant never provided this form— which represents its disability accommodation policy—to plaintiff during his employment. Doc. 49-17 at 3 (Pl.'s Dep. 72:10–73:22).

Defendant's Code of Conduct explains that it doesn't allow employment of relatives because "[e]mployment decisions must be based on merit and position requirements and made without personal bias or favoritism. This keeps our work environment positive for all." Doc. 59-6 at 6 (Def.'s Ex. F). Plaintiff testified that he'd reviewed defendant's Code of Conduct. Doc. 59-5 at 2 (Pl.'s Dep. 34:5–24).

## II.     Legal Standard

Summary judgment is appropriate if the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When the court applies this standard, it views the evidence and draws reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). But the

court "need not make unreasonable inferences or adopt one party's version of the facts if the record doesn't support it." *Harte v. Bd. of Comm'rs of Cnty. of Johnson, Kan.*, 864 F.3d 1154, 1173 (10th Cir. 2017).  An issue of "material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on the issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And, an issue of fact is "material" if it has the ability to "affect the outcome of the suit under the governing law[.]" *Id.*

The party moving for summary judgment initially bears the burden to show "the basis for its motion." *Celotex Corp.*, 477 U.S. at 323; *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (explaining that the moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law'" (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).  A summary judgment movant can satisfy this burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325; *see also Kannady*, 590 F.3d at 1169 (explaining that, to meet its summary judgment burden, the moving party "need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim" (citation and internal quotation marks omitted)).

If the moving party satisfies its initial burden, the non-moving party then "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (citation and internal quotation marks omitted); *see also Kannady*, 590 F.3d at 1169 ("If the movant carries [the] initial burden, the nonmovant may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof." (citation and internal quotation marks omitted)).  To satisfy this

requirement, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324 (citation and internal quotation marks omitted).  When deciding whether the parties have shouldered their summary judgment burdens, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

The court applies this same standard to cross motions for summary judgment.  Each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled, as a matter of law, to the judgment its motion seeks.  *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000).  Cross motions for summary judgment "are to be treated separately; the denial of one does not require the grant of another." *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).  In certain circumstances, however, ruling one motion may render the other motion moot.  *See, e.g.*, *Szczygiel v. Kansas*, No. 14-CV-3011-EFM, 2016 WL 838935, at *8 (D. Kan. Mar. 3, 2016) (denying "as moot" plaintiff's cross-motion for summary judgment and explaining that because of the court's rulings on defendant's motion for summary judgment, the court "need not consider Plaintiff's cross-motion for summary judgment").  But where the cross motions overlap, the court may address the legal arguments together.  *Berges v. Standard Ins. Co.*, 704 F. Supp. 2d 1149, 1155 (D. Kan. 2010) (citation omitted).

Summary judgment is not a "disfavored procedural shortcut[.]" *Celotex Corp.*, 477 U.S. at 327.  Instead, summary judgment is an important procedure "designed 'to secure the just,

speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1 (further citation omitted)).

### III.     Analysis

#### A.     Disability Discrimination:  Failure to Accommodate

"The ADA prohibits employers from discriminating against 'a qualified individual on the basis of disability.'" *Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1266 (10th Cir. 2015) (quoting 42 U.S.C. § 12112(a)).  "The ADA's definition of discrimination includes 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . .'" *Herrmann v. Salt Lake City Corp.*, 21 F.4th 666, 674 (10th Cir. 2021) (quoting 42 U.S.C. § 12112(b)(5)(A)).  Here, plaintiff asserts a disability discrimination claim based on defendant's failure to accommodate him.

"To establish a prima facie case of failure to accommodate, a plaintiff 'must make an initial showing that (1) [he] is disabled; (2) [he] is otherwise qualified; and (3) [he] requested a plausibly reasonable accommodation.'" *Id.* (quoting *Punt v. Kelly Servs.*, 862 F.3d 1040, 1050 (10th Cir. 2017) (internal quotation and further citation omitted)).  If plaintiff meets his prima facie burden, "the burden shifts to the defendant to 'present evidence either (1) conclusively rebutting one or more elements of plaintiff's prima facie case or (2) establishing an affirmative defense.'" *Id.* (quoting *Punt*, 862 F.3d at 1050).

Notably, failure to accommodate plaintiffs need not provide evidence of the employer's "discriminatory intent, whether direct or circumstantial[.]" *Punt*, 862 F.3d at 1048.  As our Circuit has explained, such a "plaintiff need not establish discriminatory intent to show that an action was taken 'on the basis of disability because any failure to provide reasonable accommodations for a disability is necessarily because of disability.'" *Herrmann*, 21 F.4th at

674 (quoting *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1204 (10th Cir. 2018) (internal quotation marks and further citation omitted)).  So, on a failure to accommodate claim, the court need not "probe the subjective intent of the employer[.]"  *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1178 n.12 (10th Cir. 1999).

Here, plaintiff claims defendant failed to accommodate two "plausibly reasonable" requests:  (1) accommodation within the CST position and (2) reassignment to the HST position. The court considers each theory, in turn, below.

### 1.    Whether Defendant Failed to Accommodate Plaintiff Within the CST Position

Plaintiff's prima facie case for failure to accommodate within the CST position requires him to show:  (1) he is disabled; (2) he is otherwise qualified for the CST position; and (3) he requested a plausibly reasonable accommodation.  *Punt*, 862 F.3d at 1050.  The parties don't dispute that plaintiff is disabled.  So, first, the court considers whether plaintiff was otherwise qualified for the CST position.  Then, the court considers whether plaintiff requested a plausibly reasonable accommodation.

### i.    Whether Plaintiff is Qualified for the CST Position

Plaintiff is qualified if "'with or without reasonable accommodation, [he] can perform the essential functions of the employment position[.]'"  *Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 884 (10th Cir. 2015) (quoting 42 U.S.C. § 12111(8)).  Our Circuit uses a two-step inquiry to determine whether a plaintiff is qualified.  *Lincoln*, 900 F.3d at 1192; *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1190 (10th Cir. 2003).  "First, the court determines whether the individual can perform the essential functions of the job."  *Davidson*, 337 F.3d at 1190 (citation omitted).  "Second, if (but only if) the court concludes that the individual is unable to perform

the essential functions of the job, the court determines whether any reasonable accommodation by the employer would enable him to perform those functions." *Id.* (citation omitted).

Essential functions are "'the fundamental job duties of the employment position . . . not . . . the marginal functions of the position.'" *Hawkins*, 778 F.3d at 884 (quoting 29 C.F.R. § 1630.2(n)(1)). The Circuit has explained that the "essential function analysis is not intended to second guess the employer or to require it to lower company standards." *EEOC v. Picture People, Inc.*, 684 F.3d 981, 986 (10th Cir. 2012) (quotation cleaned up). "Provided that any necessary job specification is job-related, uniformly enforced, and consistent with business necessity, the employer has a right to establish what a job is and what is required to perform it." *Id.* (citation omitted). An employer's description of a job is evidence of the job's essential functions. 42 U.S.C. § 12111(8). The court defers "to an employer's judgment concerning essential functions[.]" *Hawkins*, 778 F.3d at 884–85. But the employer's judgment is not conclusive. *Davidson*, 337 F.3d at 1191. If "the employer presents 'evidence that a job function or requirement is essential, the plaintiff bears the burden to dispute that evidence or otherwise show that the function or requirement is nonessential.'" *Lincoln*, 900 F.3d at 1192 (quoting *Kilcrease v. Domenico Transp. Co.*, 828 F.3d 1214, 1222 (10th Cir. 2016)).

Here, defendant asserts that a DOT license is an essential function of the CST position. The undisputed evidence supports defendant's view. The CST position required the employee to deliver equipment to customers, and Lang declared that she and Lewis "determined that driving was an essential component of the [CST] job." Doc. 49-11 at 3 (Lang Decl. ¶¶ 8, 9). It's undisputed that defendant's new trucks required a DOT license. Indeed, defendant's CST job description references a DOT license: "Valid driver's license and potential for DOT certification." Doc. 49-4 at 2 (Pl.'s Ex. 3). Lewis, who oversaw defendant's CSTs, testified,

"When the new DOT requirements came out . . . it was stated that anybody [who] didn't meet the physical requirements to obtain DOT certification couldn't continue to be a CST."  Doc. 59-2 at 5 (Lewis Dep. 38:9–16).  Lewis testified he told "*everyone* . . . that . . . anybody [who] doesn't meet the requirements cannot continue employment as a CST."  *Id.* (Lewis Dep. 38:9–21) (emphasis added).  When asked whether a DOT license was an essential function of the CST position, Lewis testified, "Absolutely."  Doc. 63-3 at 8 (Lewis Dep. 100:1–3).

But, plaintiff argues that a DOT license wasn't an essential function of the CST position because the job description only requires *potential* DOT certification.  Just because the job description doesn't explicitly assert that DOT license was essential doesn't mean the DOT license was nonessential.  *See Robert v. Bd. of Cnty. Comm'rs of Brown Cnty., Kan.*, 691 F.3d 1211, 1217 (10th Cir. 2012) (concluding that a duty listed on job description under "Working Conditions" and "Job Locations" rather the "Essential Functions" didn't render duty nonessential and instead confirmed importance of the duty to the position).  And, plaintiff's argument ignores undisputed facts in the summary judgment record.  It's undisputed that defendant transitioned its fleet to DOT-regulated trucks, so a DOT license was necessarily "job-related . . . and consistent with business necessity[.]"  *Picture People*, 684 F.3d at 986.  And Lewis told *everyone* the CST position required a DOT license, so the requirement was "uniformly enforced."  *Id.*  Critically, Lewis, who supervised all CSTs, testified that a DOT license was an essential function of the CST position, and the governing law directs the court to defer to his judgment.  *See Robert*, 691 F.3d at 1217 (crediting plaintiff's supervisor's testimony about what was a necessary component of plaintiff's position); *Hawkins*, 778 F.3d at 884–85 (requiring courts to defer to "employer's judgment concerning essential functions").  Plaintiff notes that defendant maintained non-DOT trucks and vans that plaintiff could have driven.  But the court need not count the trucks and vans

in defendant's fleet—defendant determined a DOT license was an essential function of the CST position and the "essential function analysis is not intended to second guess the employer[.]" *Picture Perfect*, 684 F.3d at 986 (citation and internal quotation marks omitted). In sum, defendant has presented evidence that a DOT license was an essential function of the CST position, and plaintiff has failed to dispute that evidence or show that a DOT license was nonessential. *Lincoln*, 900 F.3d at 1192.

The two-step inquiry used to determine whether the plaintiff was qualified begins by asking whether he can perform the job's essential functions. *Davidson*, 337 F.3d at 1190 (citation omitted). If he can't perform the essential functions of the job, the second step asks whether "any reasonable accommodation by the employer would enable him to perform those functions." *Id.* The court now turns to this second step of the analysis.

Plaintiff argues that defendant could have reasonably accommodated plaintiff in his CST position by using his earlier FMLA accommodations. But the FMLA accommodations were in response to plaintiff's inability to drive on nights and weekends. Defendant accommodated these limitations by covering his on-call shifts. Also, the FMLA accommodations were temporary, and they had ended. Plaintiff fails to explain how a temporary accommodation of his inability to drive on nights and weekends would accommodate his permanent inability to secure a DOT license.

In sum, no reasonable factfinder could find or infer that plaintiff was qualified for the CST job. A DOT license is essential to that job, and plaintiff hasn't come forward with any accommodation that would solve his problem. So, plaintiff's failure to accommodate claim based on accommodations within the CST position fails as a matter of law.[9]

---

[9]   The court is mindful that Stambaugh declared that he believes it "was possible to accommodate [plaintiff's] inability to drive the DOT trucks by having someone else be on call when a DOT truck was

ii.    *Plaintiff Never Requested Accommodation in his CST Position*

Plaintiff's failure to accommodate claim based on the CST position also fails the third element of its prima facie case:  whether plaintiff *requested* a plausibly reasonable accommodation.  *Punt*, 862 F.3d at 1050.  To qualify as a failure to accommodate plaintiff, the employee must have requested an accommodation.  *Koessel v. Sublette Cnty. Sheriff's Dep't*, 717 F.3d 736, 744 (10th Cir. 2013) ("[E]mployees have the burden to request accommodation[.]").  Defendant's knowledge of plaintiff's disability isn't enough.  *See Dinse v. Carlisle Foodservice Prods. Inc.*, 541 F. App'x 885, 890 (10th Cir. 2013) (rejecting plaintiff's argument that defendant's awareness of his disability was sufficient to place defendant on notice that plaintiff needed accommodation).  Here, plaintiff requested that defendant accommodate his disability, but he didn't ask defendant to make any accommodations in the CST position.  Instead, plaintiff asked defendant to reassign him to the HST position.  Thus, plaintiff's failure to accommodate claim based on the CST position also fails the third element of his prima facie case.

iii.    *Conclusion*

Plaintiff's failure to request accommodations in the CST position demonstrates that this job isn't at the heart of plaintiff's failure to accommodate claim.  Viewing the record as a whole, plaintiff's claim centers on defendant's failure to reassign him to the HST position—the

---

needed.  I know this accommodation was possible because when [plaintiff] was out on sick leave for a period of time, we were able to handle deliveries by having another individual be on call when needed."  Doc. 64-7 at 3.  But it is evidence that Stambaugh was referring to plaintiff's FMLA accommodation.  And, Stambaugh fails to explain how covering on-call shifts would solve plaintiff's DOT license problem.  So, Stambaugh's declaration doesn't create a genuine dispute of material fact warranting a trial on this issue.  As the Supreme Court has explained, the "mere existence of a scintilla of evidence in support of the plaintiff's position" doesn't suffice to survive summary judgment.  *Anderson*, 477 U.S. at 252.

accommodation that plaintiff himself actually requested.  The court now turns to this theory of an

ADA violation.

### 2. Whether Defendant Failed to Accommodate Plaintiff When It Didn't Reassign Plaintiff to the HST Position

"The ADA lists 'reassignment to a vacant position' as a possible reasonable

accommodation."  *Herrmann*, 21 F.4th at 674 (quoting 42 U.S.C. § 12111(9)).  Our Circuit has

established a specific test for failure to accommodate claims that are based on the reassignment

theory.[10]  To establish a prima facie case of reassignment as a reasonable accommodation,

plaintiff must show:

> (1) The employee is a disabled person within the meaning of the ADA and has made any resulting limitations from his or her disability known to the employer;
>
> (2) The preferred option of accommodation within the employee's existing job cannot reasonably be accomplished;
>
> (3) The employee requested the employer reasonably to accommodate his or her disability by reassignment to a vacant position, which the employee may identify at the outset or which the employee may request the employer identify through an interactive process, in which the employee in good faith was willing to, or did, cooperate;
>
> (4) The employee was qualified, with or without reasonable accommodation, to perform one or more appropriate vacant jobs within the company that the employee must, at the time of the summary judgment proceeding, specifically identify and show were available within the company at or about the time the request for reassignment was made; and
> (5) The employee suffered injury because the employer did not offer to reassign the employee to any appropriate vacant position.

*Herrmann*, 21 F.4th at 674–75 (citing *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1179 (10th

Cir. 1999) (en banc) (brackets omitted)).  The first element isn't in controversy—both parties

---

[10]  In their papers, the parties used the general three-element framework for failure to accommodate claims.  When the parties briefed these motions, they didn't have the benefit of our Circuit's decision in *Herrmann*.  The court uses *Herrmann*'s five-element framework because the Circuit recently used it in a published opinion.  And, this framework is specific to reassignment claims.  The court has rearranged the parties' arguments to fit this five-element framework, as shown in the court's analysis.

agree plaintiff is a disabled person within the meaning of the ADA. Likewise, the fifth element

isn't disputed either because defendant terminated plaintiff's employment. So, plaintiff

sustained injury. The court analyzes the three other elements from *Herrmann*, below.

> i.  *Whether Accommodation Within Plaintiff's CST Job Could*
>     *"Reasonably Be Accomplished" (Element #2 in* Herrmann)

The second element of plaintiff's prima facie case asks whether the "preferred option of

accommodation within the employee's existing job cannot reasonably be accomplished[.]" *Id.* at

674. The court already has determined that the summary judgment facts present no genuine

dispute whether plaintiff's inability to procure a DOT license could be accommodated within the

CST position. It couldn't. *See* Doc. 63 at 9 (Defendant's Response to Plaintiff's Motion for

Summary Judgment) (arguing that "there was not an accommodation that would have allowed

Plaintiff to perform the essential functions of the CST role"). Thus, plaintiff has established the

second element of his prima facie case.

> ii.  *Whether Plaintiff Requested Defendant Reasonably Accommodate*
>      *Him by Reassignment to a Vacant Position (Element #3 in*
>      Herrmann)

The third element of plaintiff's prima facie case requires him to establish that he

"requested the employer reasonably to accommodate [his] disability by reassignment to a vacant

position, which the employee may identify at the outset or which the employee may request the

employer identify through an interactive process, in which the employee in good faith was

willing to, or did, cooperate[.]" *Herrmann*, 21 F.4th at 674–75. The parties don't dispute that

plaintiff requested reassignment to the HST position. And defendant never argues that

reassignment to the HST position was an *un*reasonable accommodation. Instead, each party

claims the other failed to engage in the interactive process.

The Tenth Circuit outlined the interactive process in *Smith*:

In general, the interactive process must ordinarily begin with the employee providing notice to the employer of the employee's disability and any resulting limitations, and expressing a desire for reassignment if no reasonable accommodation is possible in the employee's existing job.

* * *

Once the employer's responsibilities within the interactive process are triggered by appropriate notice by the employee, both parties have an obligation to proceed in a reasonably interactive manner to determine whether the employee would be qualified, with or without reasonable accommodations, for another job within the company and, if so, to identify an appropriate reassignment opportunity if any is reasonably available.

180 F.3d at 1171–72. "The exact shape of this interactive dialogue will necessarily vary from situation to situation and no rules of universal application can be articulated." *Id.* at 1173. "The interactive process requires the good faith participation of <u>both</u> the employer and employee." *Aubrey v. Koppes*, 975 F.3d 995, 1007 (10th Cir. 2020). "[A]n employer's failure to engage in the interactive process will often make it difficult to resolve a case for the employer on summary judgment[.]" *Id.* at 1010 (citation and internal quotation marks omitted).

Here, the summary judgment record shows that the interactive process didn't work as intended—after all, defendant terminated plaintiff's employment. And each party blames the other for the failure of the interactive process. On the current record, a genuine dispute exists about which party bears the blame for this failure.

Defendant argues plaintiff failed to engage in the interactive process because he waited too long to request reassignment. But defendant doesn't cite any authority for its proposition that plaintiff's right to request an accommodation is subject to a time limit. Indeed, our Circuit's authority suggests otherwise. *See id.*, at 1002–03, 1013 (finding plaintiff presented factual issue whether she requested plausibly reasonable accommodation when plaintiff suggested reassignment to open position day before defendant fired her). And, plaintiff says he didn't

23

know his job was in jeopardy until November 28, when Lewis informed him that defendant was terminating his employment.  This was the same day plaintiff requested reassignment. Defendant also argues that plaintiff failed to engage in the interactive process because he didn't apply to the HST position.  This argument can't carry the day on summary judgment for four reasons.

*First*, defendant hasn't explained why its policy requiring plaintiff to apply is so important.  An employer isn't responsible for a breakdown in the interactive process if the employee fails to provide necessary information.  *See Templeton v. Neodata Servs., Inc.*, 162 F.3d 617, 619 (10th Cir. 1998) ("[T]he employee's failure to provide medical information necessary to the interactive process precludes her from claiming that the employer violated the ADA by failing to provide reasonable accommodation.").  And our Circuit recognizes that an employer might have "important employment policies" and "it would not be reasonable for an employer to set-side [those policies] in order to accomplish reassignment of a disabled employee."  *Smith*, 180 F.3d at 1176.  But defendant here hasn't explained why it was necessary that plaintiff formally apply for a transfer.  Nor has defendant argued that this policy is important.  On the current record, a reasonable factfinder could find or infer that this is the kind of policy that "might have to be subordinated to an employer's reassignment obligation under the ADA because to do otherwise would essentially vitiate the employer's express statutory obligation to employ reassignment as a form of reasonable accommodation."  *Id.*  Thus, defendant's policy doesn't limit its ADA obligations in the absence of an explanation why its policy is important and applying it to the situation at hand is necessary.

*Second*, a reasonable factfinder could find that merely telling plaintiff to identify alternate jobs and apply for them doesn't satisfy defendant's "obligation to proceed in a reasonably

interactive manner to determine whether the employee would be qualified, with or without reasonable accommodations, for another job within the company." *Smith*, 180 F.3d at 1171–72. And defendant's behavior certainly doesn't satisfy, as a matter of law, defendant's obligation to "identify an appropriate reassignment opportunity if any is reasonably available" because it placed the responsibility for identifying another position on plaintiff. *Id.*

*Third*, and even though plaintiff identified a position that he wanted—an HST job— submitting an application wouldn't have done any good. The summary judgment record shows that, even if plaintiff had applied, Oparnico wouldn't have hired him. Notably, this outcome, by itself, may violate defendant's duty to plaintiff because reassignment "means that the employee gets the vacant position if [he] is qualified for it." *Smith*, 180 F.3d at 1166–67 (citation omitted); *see also Aubrey*, 975 F.3d at 1013 n.9 ("[R]eassignment to a vacant position as a reasonable accommodation generally means the disabled employee is entitled to that position without having to compete with other applicants."); *Lincoln*, 900 F.3d at 1205 ("[I]n most situations, an employer must award the position to the disabled, but qualified, employee."). Here, admissible evidence reasonably could support a finding that defendant wouldn't have hired plaintiff for the job even if he had applied. As referenced above, defendant may have owed plaintiff the position, so a reasonable factfinder could find that defendant didn't engage in the interactive process in good faith.

*Last*, a reasonable factfinder could find that defendant didn't engage in the interactive process in good faith because defendant already had decided to terminate his employment before any interaction with plaintiff. Lang emailed Lewis talking points for plaintiff's termination on November 20, 2017, eight days before plaintiff made his reassignment request. *See Nguyen v. City & Cnty. of Denver, Colo.*, 286 F. Supp. 3d 1168, 1188 (D. Colo. 2017) (denying summary

judgment because a genuine issue existed about who was responsible for the failure of the interactive process in part because there was evidence that the employer had already decided to fire plaintiff).

In sum, a reasonable factfinder could find that defendant failed to participate in the interactive process in good faith and, therefore, it failed to accommodate plaintiff.  The court holds that plaintiff has identified a genuine issue of fact about this third element of his prima facie case, so the court must deny defendant's Motion for Summary Judgment for this reason alone.

But this conclusion doesn't mean the court must grant plaintiff's Motion for Summary Judgment.  The denial of one summary judgment motion "does not require the grant of another." *Buell Cabinet Co.*, 608 F.2d at 433.  And that is the proper outcome here.  A reasonable factfinder could find that plaintiff's failure to apply to the HST position amounted to plaintiff's own failure to engage in the interactive process.  The undisputed summary judgment facts thus present a triable issue about both parties' engagement in the interactive process in good faith. This genuine dispute of fact is material and so, only a trial can resolve it.

> iii.   *Whether Plaintiff was Qualified for a Vacant HST Position (Element #4 in* Herrmann*)*

To survive summary judgment, the fourth element of plaintiff's prima facie case requires him to show that he "was qualified, with or without reasonable accommodation, to perform one or more appropriate vacant jobs within the company[.]" *Herrmann*, 21 F.4th at 675 (citing *Smith*, 180 F.3d at 1179).  And, plaintiff must "specifically identify and show" a vacant position was "available within the company at or about the time the request for reassignment was made[.]" *Id.*  The court first considers whether plaintiff was qualified for the HST position.

Then, the court considers whether plaintiff has identified a specific vacant HST position that was available.

The CST job duties are the same as the HST job duties except that a CST job also requires driving.  So, a reasonable factfinder could find or infer that plaintiff was qualified for the HST position.  The court isn't persuaded by defendant's argument that plaintiff wasn't qualified for the HST position because performing the essential functions of the HST position occurs in a sterile, hospital setting, and plaintiff received a verbal warning about his hygiene. This argument impermissibly conflates plaintiff's performance with his qualifications. Performance issues unrelated to plaintiff's disability are irrelevant to the question whether plaintiff is qualified.  *See Nguyen*, 286 F. Supp. 3d at 1182 (explaining that employer's arguments about performance issues are unrelated to employee's disability and thus are irrelevant to whether plaintiff could establish prima facie case); *see also Angell v. Fairmount Fire Prot. Dist.*, 907 F. Supp. 2d 1242, 1251 (D. Colo. 2012) (concluding plaintiff's alleged performance issues were "entirely irrelevant to the issue of whether Plaintiff was qualified to perform the essential functions of his job"); *Jacobsen v. Dillon Cos.*, No. 10-cv-1944-LTB-BNB, 2012 WL 638122, at *4 (D. Colo. Feb. 28, 2012) (rejecting employer's "attempts to re-characterize Plaintiff's job performance as a job requirement"); *Aquart v. Ascension Health Info. Servs.*, No. A-09-CA-804-AWA, 2011 WL 233587, at *9 (W.D. Tex. Jan. 24, 2011) ("Generally, the question centers on whether the plaintiff's *disability*, with or without reasonable accommodation, prevents her from performing the essential functions of a position."); *Ricks-Lankford v. Tex. Dep't of Assistive & Rehab. Servs.*, No. A-10-CA-011 SS, 2011 WL 5040439, at *4 (W.D. Tex. Oct. 24, 2011) (rejecting defendant's argument that plaintiff wasn't qualified based on alleged inadequate performance because defendant "conflate[d] whether the Plaintiff

was qualified for her position with the question of whether she was performing her duties properly or well"); *Carter v. Potter*, No. Civ.A.02-7326, 2004 WL 2958428, at *10 (E.D. Pa. Dec. 21, 2004) ("The parties' dispute over whether plaintiff adequately performed his mail casing tasks is not a dispute over plaintiff's objective qualifications for the job, but rather one over adequacy of performance.").

Next, to survive summary judgment on this fourth element from *Herrmann*, plaintiff must identify a specific vacant HST position available at or about the time plaintiff requested reassignment. *Herrmann*, 21 F.4th at 675 (citing *Smith*, 180 F.3d at 1179). Plaintiff requested reassignment on November 28, 2017. He has marshalled evidence that defendant hired full time HSTs at its KUMC location on November 6, 2017, November 7, 2017, November 13, 2017, November 20, 2017, November 27, 2017, December 4, 2017, and February 12, 2018. Doc. 49-12 at 2, 5, 6 (Pl.'s Ex. 11). The December 4, 2017 hire may carry particular significance to a trier of fact because it occurred after plaintiff had requested reassignment on November 28 but before his last day of work on December 11. A reasonable factfinder could find that defendant had a vacant HST position available on or reasonably near November 28, 2017. Thus, plaintiff has established that a reasonable jury could find for him on the fourth element of his prima facie case. This conclusion precludes summary judgment for defendant for another independent reason. And, yet again, this outcome doesn't entitle plaintiff to summary judgment on the issue. The summary judgment facts—when viewed in the light most favorable to defendant—don't establish that a reasonable jury could only conclude that a position was vacant. This precludes summary judgment for plaintiff.

In sum, the court concludes that plaintiff has established a triable issue on all five elements of *Herrmann*'s prima facie case of reassignment as a reasonable accommodation. But

he hasn't shown that the summary judgment facts establish each of the five elements as a matter of law.  So, the court denies both parties' Motions for Summary Judgment on plaintiff's ADA failure to accommodate claim.

### B.    Disability Discrimination:  "Regarded As" Disabled

 Plaintiff also makes an independent claim for disability discrimination.  This claim relies on plaintiff's second theory, *i.e.*, that defendant regarded him as disabled.  The court now turns to this second theory.

Plaintiff moves for summary judgment on this "regarded as" claim, arguing he has provided direct evidence that defendant discriminated against him because it regarded him as disabled.  Doc. 29 at 38–33.  A plaintiff may prove employer discrimination either by direct or circumstantial evidence.[11]  *See Ramsey v. City & Cnty. of Denver*, 907 F.2d 1004, 1007–08 (10th Cir. 1990).

"Direct evidence of discriminatory animus is rare."  *Herrmann*, 21 F.4th at 678.  "'Direct evidence demonstrates on its face that the employment decision was reached for discriminatory reasons.'"  *Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 883 (10th Cir. 2018) (quoting *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1249 (10th Cir. 2002)).  "Evidence of discrimination, if believed, is only direct evidence if it proves the existence of a fact in issue without inference or presumption."  *Id.* (internal quotation marks and citation omitted).  Direct evidence requires a causal connection—"discriminatory statements do not qualify as direct evidence if the context or timing of the statement is not closely linked to the adverse decision." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013).

---

[11]    If plaintiff "presents direct evidence of discrimination, the *McDonnell Douglas* burden-shifting analysis doesn't apply."  *Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 883 (10th Cir. 2018) (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985)).

When an ADA plaintiff relies on direct evidence, he also must show that the person who made discriminatory statements had decision-making authority.  For example, our Circuit held that the circumstances presented in *Osborne v. Baxter Healthcare Corp.* presented a genuine issue of fact.  798 F.3d 1260 (10th Cir. 2015).  There, defendant's human resources department "indisputably rescinded [plaintiff's] job offer because of her disability."  *Id.*  Our Circuit also found a genuine issue of direct evidence when "a decisionmaker during an interview [for a promotion] express[ed] discriminatory beliefs about whether [women were] capable of doing the job[.]" *Tabor*, 703 F.3d at 1217.  And, in *Dunsworth v. National Oilwell Varco, L.P.*, an Oklahoma federal court found a genuine issue of direct evidence when a decisionmaker expressly told plaintiff that their jobs were not going to work out "because of 'the physical issues and needing to take pain meds for them' and because Defendant did not favor 'hiring people with physical disabilities.'"  No. CIV-17-895-D, 2019 WL 2251292, at *4, 4 n.4 (W.D. Okla. May 24, 2019).

Here, plaintiff argues he has adduced direct evidence of disability discrimination based on Oparnico's testimony and, thus, is entitled to summary judgment.  Specifically, Oparnico, when asked why he said no to plaintiff's proposed reassignment to the HST position, testified that he was worried about plaintiff's ability to handle the job's physical requirements based on his lung capacity as a smoker and because plaintiff had experienced a stroke.  Doc. 49-9 at 6, 8, 9 (Oparnico Dep. 22:20–24:25, 38:5–22, 44:1–17).  Defendant tries to head this argument off at the pass, arguing that Oparnico didn't have decision-making authority because plaintiff never applied for the HST position.

Oparnico's decision-making authority isn't clear in the summary judgment record.  Oparnico didn't terminate plaintiff's employment.  Oparnico didn't even know about plaintiff's

DOT license issue within the CST position.  Doc. 64-9 at 5 (Oparnico Dep. 19:8–20:20).  And Oparnico wasn't solely responsible for accommodating plaintiff.  Defendant's policy charged Lang, its Director of Human Resources, with responsibility for its Equal Employment Opportunity program, and plaintiff submitted his reassignment request to Lewis.  Plaintiff argues that Oparnico's beliefs about plaintiff's physical abilities influenced Lewis, but Lewis testified that he told plaintiff, if he was interested, to apply through the system to Oparnico and after that, he "didn't really have . . . any part in the process[.]"  Doc. 59-2 at 13 (Lewis Dep. 64:15–65:15).  A reasonable factfinder could find that Oparnico's statements, because he didn't decide to terminate plaintiff and other people were involved in the process, don't qualify as direct evidence.  But, a reasonable factfinder also could find that plaintiff has adduced direct evidence of disability discrimination.  This genuine dispute precludes summary judgment in plaintiff's favor.

In sum, plaintiff's Motion for Summary Judgment against his disability discrimination claim is denied.  And, defendant's Motion for Summary Judgment on plaintiff's disability discrimination also is denied.

## C.    Age Discrimination

Plaintiff also asserts an ADEA claim for age discrimination against defendant (Count II) and defendant moves for summary judgment against it.  Plaintiff argues he can satisfy his prima facie burden and survive summary judgment under either the direct or circumstantial evidence standard.  The court begins its analysis by evaluating plaintiff's argument that he has adduced direct evidence of age discrimination.  This argument matters so much because, if plaintiff indeed possesses direct evidence, then the court need not apply the *McDonnell Douglas* burden-

shifting framework, and plaintiff doesn't need evidence of pretext.  *See Jones v. Azar*, 772 F. App'x 692, 695 (10th Cir. 2019).

Plaintiff's argument of direct evidence contends that Oparnico made-age related comments when he explained why he didn't think plaintiff could do the HST job.  Utilizing the same test for direct evidence articulated in this Order's ADA analysis, the court rejects plaintiff's proposition.

Again, Oparnico's decision-making authority is in dispute.  Plaintiff's argument that Oparnico "was given the sole authority to hire Plaintiff" is not supported by citation to the record.  Doc. 64 at 37.  Indeed, this argument requires the court to infer that Oparnico had *sole* authority, given the involvement of Lang and Lewis and the absence of plaintiff's application for the HST position.  But, direct evidence "proves the existence of a fact in issue *without inference or presumption*."  *Fassbender*, 890 F.3d at 883 (emphasis added).

Oparnico's testimony discusses *his* age, not plaintiff's.  Oparnico was concerned plaintiff "was not physically able to do the demands of the job."  Doc. 49-9 at 8 (Oparnico Dep. 38:5–22).  Oparnico testified that the HST position "was physically challenging for me at the time and I was young.  I would consider myself healthy.  *Id.*  To glean discriminatory intent from this statement would, again, require an inference that Oparnico was comparing his age to plaintiff's.  Thus, Oparnico's testimony doesn't constitute direct evidence of age discrimination.

Plaintiff alternatively argues that, even if Oparnico's statements don't amount to direct evidence of age discrimination, he has adduced circumstantial evidence of discrimination.  To evaluate ADEA claims based on circumstantial evidence, the court applies the familiar *McDonnell Douglas* burden-shifting framework.  *McKnight v. Kimberly Clark Corp.*, 149 F. 3d 1125, 1128 (10th Cir. 1998) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04

(1973)).  This framework requires plaintiff, first, to establish a prima facie case.  The prima facie

case requires plaintiff to show that he (1) is " a member of the class protected by the ADEA, (2)

suffered an adverse employment action, (3) [was] qualified for the employment position at issue,

and (4) [was] treated less favorably than others not in the ADEA protected class."  *Roberts v.*

*Winder*, 16 F.4th 1367, 1384 (10th Cir. 2021) (citing *Jones v. Okla. City Pub. Schs.*, 617 F.3d

1273, 1279 (10th Cir. 2010)).  If plaintiff meets the prima facie burden, the burden shifts "to the

employer to articulate some legitimate, nondiscriminatory reason for its action.'"  *Id.* (citation

and internal quotation marks omitted).  If defendant carries "this burden, the plaintiff must then

have an opportunity to prove by a preponderance of the evidence that the legitimate reasons

offered by the defendant were not its true reasons but were a pretext for discrimination."  *Id.*

(citation and internal quotation marks omitted).

　　　　Plaintiff argues defendant discriminated against him based on his age when it failed to

reassign him to the HST position.  At the first stage of the burden-shifting framework, defendant

argues plaintiff cannot establish the third element of his prima facie case, *i.e.*, that he was

qualified for the HST position.  But, given that the HST position has the exact same requirements

as plaintiff's CST position (minus the driving required of a CST), a reasonable factfinder could

find that plaintiff was qualified for the HST position.  Defendant doesn't challenge the other

requirements of the prima facie case.

　　　　The analysis thus moves to the second stage of the burden-shifting framework—the one

requiring defendant to articulate a legitimate, non-discriminatory reason.  *Roberts*, 16 F.4th at

1384.  Defendant asserts that it didn't reassign plaintiff to the HST position because he never

applied for the HST position.  Doc. 74 at 15.  Defendant thus satisfies its burden at the second

stage, shifting the burden back to plaintiff to establish, by a preponderance of the evidence, that

defendant's reason is a pretext for discrimination.  *Roberts*, 16 F. 4th at 1384.

> Plaintiff may show pretext in one of two ways:
>
> (1) by showing that the proffered reason is factually false or (2) by showing that discrimination was a primary factor in the employer's decision, which is often accomplished by revealing "weakness, implausibility, inconsistencies, incoherencies, or contradictions in the employer's proffered reason," such that a reasonable fact finder could deem the employer's reason "unworthy of credence."

*Tabor*, 703 F.3d at 1218 (quoting *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217 (10th

Cir. 2002) (brackets omitted)).

Plaintiff argues he has adduced sufficient evidence of pretext to survive summary

judgment because defendant gave inconsistent reasons for not reassigning him to the HST

position.  Defendant stated that plaintiff couldn't have the HST job because he never applied.

But that's not what Oparnico said.  Oparnico said "no" to the idea of plaintiff's transfer because

he was worried about plaintiff's health.  Oparnico testified,  "I didn't want him to get hurt

knowing . . . the exact physical toll . . . he would take . . . . It was physically challenging for me

at the time and I was young." Doc. 49-9 at 8 (Oparnico Dep. 38:5–22).  Based on this

inconsistency, a reasonable factfinder could infer that Oparnico didn't want plaintiff to transfer

because of plaintiff's age.  And plaintiff's age and physical abilities has nothing to do with

whether plaintiff applied.  Thus, the court concludes, plaintiff has adduced evidence of

"inconsistencies . . . in the employer's proffered reason[s]." *Tabor*, 703 F.3d at 1218 (quoting

*Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002)).

Plaintiff has presented a triable issue on his age discrimination claim.  The court thus

denies defendant's summary judgment motion against plaintiff's age discrimination claim.

## IV.    Conclusion

For the reasons provided above, plaintiff's Motion for Summary Judgment (Doc. 48) is denied, as is defendant's Motion for Summary Judgment (Doc. 58).

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiff's Motion for Summary Judgment (Doc. 48) is denied.

**IT IS FURTHER ORDERED BY THE COURT THAT** defendant's Motion for Summary Judgment (Doc. 58) is denied.

**IT IS SO ORDERED.**

**Dated this 4th day of February, 2022, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**